J-A23044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: I.M.R., AN ALLEGED INCAPACITATED PERSON | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: WILLIAM CARDWELL | : : : : : : : : | |
| | : | No. 728 MDA 2022 |

Appeal from the Decree Entered April 8, 2022
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): 2021-281

BEFORE: BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.: **FILED: JUNE 7, 2023**

William Cardwell appeals from the April 8, 2022 decree adjudicating I.M.R. to be a totally incapacitated person and appointing Huntingdon-Bedford-Fulton Area Agency on Aging ("the Agency") as the permanent plenary guardian of the person and estate of I.M.R. We affirm.

In a prior memorandum, we detailed the factual and procedural history of this case as follows:

> I.M.R. was born in November 1938. In 2014, I.M.R. displayed symptoms of cognitive decline and memory loss that would eventually be diagnosed as vascular dementia, a progressive condition which impairs her ability to function independently. Immediately prior to September 2021, she resided with her adult son, Appellant, who exercised power of attorney on her behalf. The agency became involved with the family on September 13, 2021, after a stranger discovered I.M.R. wandering alone, unable to state her name, and indicating that

_____

[*] Former Justice specially assigned to the Superior Court.

she did not want to live with her son. N.T., 12/20/21, at 24. Appellant refused to cooperate fully with the Agency's subsequent investigation of the incident. *Id*. at 25-27.

On December 6, 2021, the Agency sought and received the appointment of an emergency plenary guardian of both the person and estate of I.M.R. Thereafter, on December 15, 2021, the Agency filed a petition to adjudicate incapacity and to appoint a permanent plenary guardian for the person and estate of I.M.R. The petition alleged that I.M.R. needed daily care and supervision to ensure her safety, and it averred that no alternative to the appointment of a guardian had been considered.

Following four non-consecutive evidentiary hearings, the orphans' court entered the above-described decree adjudging I.M.R. to be totally incapacitated and appointing the Agency as the permanent plenary guardian of both the person and estate of I.M.R. Appellant timely filed a notice of appeal, and the orphans' court filed a Pa.R.A.P. 1925(b) order directing him to file and serve a Rule 1925(b) statement within twenty-one days of the order.

*In Re: I.M.R.*, 728 MDA 2022 (Pa.Super. filed March 16, 2023) (nonprecedential memorandum at 1-2).

Appellant initially failed to file the statement within the allotted period, and the orphans' court found all issues waived and declined to address the merits of any of the issues presented. *Id*. at 2-3. However, this Court determined that, because the orphans' court's Rule 1925(b) order was facially deficient, Appellant's failure to strictly comply with Rule 1925(b) did not render his claims waived on appeal. *Id*. at 7. Hence, we remanded the matter for the preparation of a supplemental orphans' court opinion, which the orphans' court filed on April 11, 2023.

Appellant presents five issues for our review.[1]

1. Did the orphans' court abuse its discretion or make an error of law when it granted the Huntingdon- Bedford- Fulton Area Agency on Aging's motion for access to records without giving [I.M.R.] or William Cardwell an opportunity to respond?

2. Did the [orphans'] court abuse its discretion or make an error of law when it granted emergency guardianship without a hearing when there was no adequate proof of an actual emergency?

3. Did the [orphans'] court abuse its discretion or make an error of law when it prohibited Shaun O'Toole, Esq., [I.M.R.'s] previous attorney, from representing [her] . . . in this matter?

4. Did the [orphans'] court abuse its discretion or make an error of law when it failed to appoint William Cardwell as guardian of [I.M.R.'s] person despite no Area Agency on Aging observ[ations] inside their home; only one caretaker witness who observed William Cardwell and [I.M.R.] together inside the home over a span of a few months; and [evidence that I.M.R.] walk[ed] away from the home on one brief occasion three months before the guardianship petition was filed?

5. Did the [orphans'] court abuse its discretion or make an error of law when it failed to appoint William Cardwell as guardian of [I.M.R.'s] estate in light of four witnesses and the estate planning documents presented clearly stating [I.M.R.'s] desired intention for William Cardwell to inherit everything from her and the ability to make gifts to himself?

Appellant's brief at 4-6 (cleaned up) (unnecessary capitalization omitted).

Appellant's claims challenge the orphans' court's finding of incapacity and subsequent appointment of a guardian, which we review for legal error or

---

[1] As we noted in our prior memorandum, we do not address the sixth issue that Appellant raised in his statement of questions presented, concerning the March 19, 2022 invalidation of a transfer of land, because Appellant failed to appeal the order that is the genesis of that claim.

an abuse of discretion. ***In re Duran***, 769 A.2d 497, 506 (Pa.Super. 2001). As we have explained,

> The appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion. Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

***Id***. (cleaned up).

Pursuant to Chapter 55 of the Probate, Estates, and Fiduciaries Code ("PEF Code"), an orphans' court may appoint a guardian of the person and/or estate upon clear and convincing evidence of incapacity. ***See*** 20 Pa.C.S. § 5511(a). The PEF Code defines incapacitated person as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501.

As to the orphans' court's determination of incapacity and appointment of a guardian, the PEF Code further provides, in pertinent part, as follows:

> **(a) Determination of incapacity.**--In all cases, the court shall consider and make specific findings of fact concerning:
>
> > (1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.
> >
> > (2) The extent of the individual's capacity to make and communicate decisions.

(3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of advance directives such as durable powers of attorney or trusts.

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship.

. . . .

**(c) Plenary guardian of the person.**--The court may appoint a plenary guardian of the person only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.

. . . .

**(e) Plenary guardian of the estate.**--A court may appoint a plenary guardian of the estate only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.

20 Pa.C.S. § 5512.1.

For the following reasons, we discern no error or abuse of discretion on the part of the orphans' court. In the supplemental opinion, the orphans' court thoroughly distilled the relevant evidence concerning: (1) I.M.R.'s cognitive impairment; (2) the effect of those impairments on I.M.R.'s ability to communicate decisions, manage financial resources, and insure her physical health and safety; (3) Appellant's suspect care of I.M.R.'s physical and financial needs, including the alleged misappropriation of the $250,000

proceeds from her late-husband's life insurance policy; and (4) Appellant's persistent obstinacy, which not only frustrated the Agency's ability to serve I.M.R.'s needs, but also led to the suspension of Appellant's visitation privileges from the residential facility that cared for I.M.R. after she was removed from Appellant's home. As the learned President Judge George N. Zanic concluded in the supplemental opinion filed in this case,

> The focus of this case should be I.M.R. However, [Appellant] has continuously attempted to make it about himself. Time and time again he has shown that his true concern is maintaining control over I.M.R. and her assets, rather than acting in her best interest. I.M.R. is incapacitated and in need of a guardian. That guardian needs to be someone other than [Appellant], so that he can no longer exploit her.

*See* Orphans' Court Supplemental Opinion, 4/11/23, at 61.

Thus, after reviewing the certified record, the parties' briefs, and the orphans' court's comprehensive sixty-one-page supplemental Rule 1925(a) opinion addressing the identical issues that Appellant presented in his brief, albeit in a slightly different order, we adopt the trial court's rationale as our own and for the reasons cogently explained in the supplemental opinion, we affirm the April 8, 2022 decree adjudicating I.M.R. to be a totally incapacitated person and appointing the Agency as the permanent plenary guardian of the person and estate of I.M.R.[2]

_____

[2] President Judge Zanic's analysis of Appellant's third issue, concerning the denial of Appellant's request to have Attorney O'Toole appointed as counsel
*(Footnote Continued Next Page)*

for I.M.R., incorporated the court's January 24,2022 order stating that Attorney O'Toole was ineligible to serve as I.M.R.'s counsel in the competency/guardianship matter due to both a conflict of interest between Appellant and I.M.R. and the fact that Attorney O'Toole was a necessary witness. Citing Pennsylvania Rules of Professional Conduct 1.7 and 3.7, entitled "Conflict of Interests: Current Clients" and "Lawyer as Witness", respectively, the court provided the following rationale:

> Attorney O'Toole represented [I.M.R.] with respect to estate planning that occurred in or about 2018. That estate planning, though, was done in coordination with [Appellant], and included the power of attorney in favor of [Appellant] that is one of the many matters at issue here. Given the significant level of involvement in those affairs testified to by [Appellant], there was, at minimum, a quasi (if not actual) attorney-client relationship between Attorney O'Toole and [Appellant] at that time. This finding is supported by the fact that when the emergency guardianship was initiated the first person [Appellant] contacted to contest it was Attorney O'Toole (meaning that while there may not be a formal, current attorney-client relationship between them, there is still arguably a quasi one). . . . Attorney O'Toole cannot represent both [I.M.R.'s] interests and [Appellant's] interests, as they are not congruent. (For example, if it is in [I.M.R.'s] best interest to have a guardian appointed, and to have that guardian be someone other than [Appellant], that position is diametrically opposed to [Appellant's] interests in remaining the caregiver and power of attorney for her.) This is a clear conflict of interest that violates Rule 1.7.
>
> . . . .
>
> [As to the likelihood of being a necessary witness, h]ere, Attorney O'Toole drafted the power of attorney and other estate planning documents that are at issue, as they establish what right, power, and authority [Appellant] has with respect to [I.M.R.'s] property—property that [Appellant] is alleged to have misappropriated and converted to his own use. More significantly, though,[Attorney O'Toole] is the only disinterested party with knowledge of [I.M.R.'s] capacity both in 2018 and at the current time (in light of his estate planning meetings with her in 2018 and his recent meeting with her on January 10, 2022, regarding the

*(Footnote Continued Next Page)*

Decree affirmed.

Judge McCaffery joins.

P.J.E. Stevens concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/7/2023

---

proposed Engagement Letter), and thus the changes, if any, in her condition during that period.

Order, 1/24/22, at 3-5 (cleaned up). We adopt the foregoing analysis as well.

**IN THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY, PENNSYLVANIA**
**ORPHANS' COURT DIVISION**

IN RE: IVA M. ROUSH,            :          CP-31-OC-281-2021
an incapacitated person       :          728 MDA 2022

### AMENDED OPINION IN SUPPORT OF ORDER PURSUANT TO Pa.R.A.P. 1925(a)

Petitioner William Cardwell, the son of incapacitated person Iva M. Roush ("I.M.R."), appeals from the Final Decree entered by this Court on April 8, 2022, which: (1) adjudged I.M.R. to be totally incapacitated; and (2) appointed the Huntingdon-Bedford-Fulton Area Agency on Aging to be the plenary permanent guardian of both I.M.R.'s person and estate.

This Court originally filed its Opinion in Support of Order Pursuant to Pa.R.A.P. 1925(a) on March 27, 2022. Because Petitioner had not, either within the established 21-day deadline or as of the filing of such opinion, filed a Statement of Errors Complained of On Appeal, this Court originally proceeded on the basis that he had waived all issues. Pursuant to the Superior Court's order of March 16, 2023, this Court hereby submits this Amended Opinion in Support of Order Pursuant to Pa.R.A.P. 1925(a), which amends and supplements its original, and addresses Petitioner's late-filed Statement.

### I. ISSUES RAISED

Petitioner's even-later-filed Amended Statement of Matters Complained of On Appeal, filed June 13, 2022,[1] raises the following issues (text as in the original):

1.      The trial court abused its discretion and/or made an error of law when it granted the Huntingdon-Bedford-Fulton Area Agency on Aging's Motion for Access to Records without giving Iva M. Roush an opportunity to respond.

---

[1] Petitioner filed his original statement of errors on May 31, 2022, followed by his amended statement. The Court makes no finding with regard to whether Petitioner's original late-filed statement or his even-later-filed amended statement should apply here. Since they are largely the same, the Court proceeds on the basis of the amended statement.

FILED April 11, 2023
Kelsey Dunn Register of Wills
and Clerk of the Orphans' Court
Huntingdon County, Pennsylvania



2. The trial court abused its discretion and/or made an error of law when it granted the Huntingdon-Bedford-Fulton Area Agency on Aging's Motion for Access to Records without giving William Cardwell an opportunity to respond.

3. The trial court abused its discretion and/or made an error of law when it granted Emergency Guardianship without a hearing when there was no adequate proof of an actual emergency.

4. The trial court abused its discretion and/or made an error of law when it granted Emergency Guardianship without any medical expert testimony or any medical evidence showing a need for guardianship.

5. The trial court abused its discretion and/or made an error of law when it prohibited Shaun O'Toole, Esq., Iva M. Roush's previous attorney, from representing Iva M. Roush in this matter.

6. The trial court abused its discretion and/or made an error of law when it failed to appoint William Cardwell as guardian of Iva M. Roush's person despite no Area Agency on Aging observing inside their home; only one (1) caretaker witness who observed William Cardwell and Iva M. Roush together inside the home over a span of a few months; and Iva M. Roush walking away from the home on one (1) brief occasion three months before the guardianship petition was filed?

7. The trial court abused its discretion and/or made an error of law when it failed to appoint William Cardwell as guardian of Iva M. Roush's estate in light of four (4) witnesses and the estate planning documents presented clearly stating Iva M. Roush's desired intention for William Cardwell to inherit everything from her and the ability to make gifts to himself?

8. The trial court abused its discretion and/or made an error of law when it voided the deed signed by William Cardwell in light of the fact that the Area Agency on Aging never requested that William Cardwell be removed as power of attorney of Iva M. Roush and the Court did not remove him prior to signing the deed?

## II. PROCEDURAL HISTORY AND RELEVANT FACTS

1. I.M.R. is currently 84 years old, having been born on November 27, 1938.

2

2. This matter first came to the attention of the Court on September 22, 2021, when the Huntingdon-Bedford-Fulton Area Agency on Aging (the "Agency") filed a petition for access to I.M.R.'s medical and financial records pursuant to the Pennsylvania Older Adult Protective Services Act, 35 P.S. §§ 10225.101, *et seq.* (the "OAPSA"), and the guardianship support agency provisions of 20 Pa. C.S. ch. 55 (such petition, the "Records Petition.") The Records Petition was granted by this Court *ex parte* the same day.

3. On December 6, 2021, the Agency filed a petition to adjudicate incapacity and to appoint an emergency and permanent guardian of I.M.R.'s person and estate (the "Emergency Petition"). The Emergency Petition was supported by a signed statement provided by I.M.R.'s treating physician, Dr. Amy Sellers, who opined that I.M.R. "should not be left alone," "suffers from mild–moderate dementia & gets confused easily," is "[n]ot capable of higher[-]level executive functioning," and "needs care including help with [activities of daily living] & monitoring so she does not wander off." The Court granted the emergency guardianship *ex parte* the same day. It appointed the Agency as the emergency guardian of I.M.R.'s person and estate, and appointed Ray A. Ghaner, Esq., to represent I.M.R.[2]

4. On December 7, 2021, the Agency filed a petition to extend the emergency guardianship. That petition was granted, and the emergency guardianship was extended until December 28, 2021.

5. On December 8, 2021, Shaun E. O'Toole, Esq., filed a praecipe for entry of appearance, seeking to represent I.M.R. in lieu of Attorney Ghaner.

6. On December 10, 2021, Roberto D. Ugarte, Esq., filed a praecipe for entry of appearance, representing Petitioner.

---

[2] This was done per the Court's standard practice, which is to appoint counsel for the alleged incapacitated person in all guardianship cases, unless they are already represented by counsel. The Court notes here that Attorney Ghaner did not have an opportunity to address the scope and nature of his meetings with his client, I.M.R., until much later in the case than usual. This is because of the unusual progression of this matter. However, Attorney Ghaner did inform the Court that he had met with I.M.R. twice prior to the second hearing in this matter on February 1, 2022. N.T., February 1, 2022, Hearing, at 67. Attorney Ghaner addressed the matter of his meetings with I.M.R. in detail at the third hearing, held on February 8, 2022. See ¶61, *infra.*

3

7. On December 15, 2021, Attorney O'Toole filed a petition for reconsideration of the emergency guardianship, asserting, *inter alia*, that in 2018 I.M.R. had executed a general power of attorney in favor of Petitioner (the "Alleged POA"), and that Petitioner had been serving as I.M.R.'s caregiver prior to the emergency guardianship. That same day, the Agency filed a petition seeking to have I.M.R. be adjudicated as fully incapacitated and to be appointed as plenary guardian of I.M.R.'s person and estate (the "Guardianship Petition").

8. On December 16, 2021, Attorney Ugarte filed, on behalf of Petitioner, an emergency petition to remove the Agency as guardian and to conduct a review hearing. Petitioner asserted that he had full authority over I.M.R.'s property and healthcare decisions pursuant to the Alleged POA, that he served as I.M.R.'s caregiver, and then asserted a litany of deficiencies with the Emergency Petition and the Agency's actions in general.

9. On December 20, 2021, the first hearing was held in this matter, addressing the Emergency Petition, Attorney O'Toole's proposed representation of I.M.R., and Petitioner's emergency petition to remove the Agency as guardian (such hearing, the "First Hearing").

10. The Court first addressed Attorney O'Toole's praecipe for entry of appearance. The Court extensively queried Attorney O'Toole regarding whether he had undertaken actions that might satisfy the requirements of Pa.R.O.C.P. 14.4(b), including whether he had a current engagement letter with I.M.R. regarding the guardianship proceeding and whether he had met with I.M.R. Attorney O'Toole represented that he did not have a current engagement letter with I.M.R., had not met with her since 2018 when he prepared the Alleged POA, and had minimal knowledge of the matter. He had simply been contacted by Petitioner, notified by him that I.M.R. had been "taken" by the Agency, and requested by Petitioner to intervene. Because Attorney O'Toole had not complied with Rule 14.4(b), as well as had potential conflicts arising from his preparation of the Alleged POA and contacts with Petitioner, the Court did not allow him to represent I.M.R. at

4

the First Hearing. It did, however, did allow him to be present so he was aware of the proceedings. N.T., First Hearing, at 2–9. The Court further directed the Agency to assist Attorney O'Toole in arranging a meeting with I.M.R. and ordered Attorney O'Toole, if he was satisfied after such meeting that I.M.R. wished to have him represent her, to comply with the requirements of Rule 14.4(b). N.T., First Hearing, at 104.

11. The first witness for the Agency was Bonnie Sue Parks.

   a. Ms. Parks primarily works at the Giant store in Smithfield Township, Huntingdon County, but also makes additional income on the side as an informal home health aide/caregiver. She met Petitioner through her employment at Giant, and Petitioner made arrangements with her to provide care for I.M.R. at his home in the James Creek area of Huntingdon County.[3] She was initially paid in cash, but was also later paid in-kind (Petitioner gave her a car, and she "worked off" the value of the car). Id. at 10–11, 17–18

   b. Ms. Parks would go to the home two to three times a week, staying anywhere from 45 minutes to two hours. Ms. Parks's primary task was to give I.M.R. showers, but she also assisted with many other tasks, including laundry, dressing, medication, changing bedclothes, and preparing meals. The other residents of the home were Petitioner and his mechanic, known to her only as "Bill." Id. at 10–11, 13.

   c. Per Ms. Parks, the condition of the home was quite poor.

      Q: And so I know this will be difficult but I'd like you to describe the condition of the home Iva lives in.

      A: The home is dirty.

      Q: Is it fair to say that you've described it as a quote, unquote shit hole?

      A: I can't say shit hole but it does—it is dirty.

      Q: There a lot of dog feces throughout the home?

---

[3] Specifically, 3016 Tussey Lane in Lincoln Township, Huntingdon County, with a mailing address of 3016 Tussey Lane, James Creek, PA 16657.

A: Yes.

Q: Cats throughout the home?

A: There is only one cat.

Q: The kitchen, has that been described as a hog pen?

A: I have went out there, yes, and it has been very dirty.

Q: Is that because there are a lot of dirty dishes?

A: Dirty dishes. The floor is very dirty at times.

Q: How about spoiled food in crockpots, things like that?

A: I have seen that, yes.

Id. at 12 (testimony of Ms. Parks on direct examination by the Agency's counsel, Michael M. Kipphan, Esq.)

d. Ms. Parks further testified that I.M.R. did not have the level of care she needed, and the level of care she did receive from Petitioner was poor.

Q: To your knowledge, Bonnie, have there been times when Iva's been left alone?

A: Yes, there has been a few times I have went out there and she has been alone.

Q: Does that concern you when you see that?

A: Yes, it does, because she—like I said, she is not able to take care of herself and she falls. She has no phone to contact anybody with.

Q: Have you come to the home and found Iva covered in feces before?

A: I have come there and like her diaper that she wears has had feces in it, yes.

Q: How are Iva's meds managed? You put them in a seven day box and [Petitioner] gives them to her?

A: He either gives them to her or sets them on the table when she gets up in the morning. Then she gets them.

Q: Would it be fair to say that Iva can't take care of her own meds?

A: Correct.

6

Q: How does Iva get around? Does she need a walker?

A: She—yes she, does walk sometimes without her walker but she is very unstable.

Q: Based on your observations is she a fall risk?

A: Yes.

Q: Has Iva shared with you that she also hallucinates about people in trees and things like that?

A: Yes, she has.

Q: And have you noticed that she has some cognitive thinking disabilities?

A: Yes.

***

THE COURT: Can I ask, ma'am, when was the last time you saw Iva?

THE WITNESS: It would have been the day that they came to get her which I think was December 6th.

THE COURT: Okay. And when you saw her was this one of the days when her diaper was full of feces?

THE WITNESS: No, no.

THE COURT: When was the last time that happened?

THE WITNESS: That's when she was sick and she was having the diarrhea, so at times she couldn't get her diaper down fast enough.

THE COURT: Okay. When you're not there, do you know who takes care of her?

THE WITNESS: [Petitioner] had told me that his mechanic Bill has cleaned her up.

Id. at 12–14 (testimony of Ms. Parks on direct examination by Attorney Kipphan, with follow-up by the Court).

e. Upon examination by I.M.R.'s counsel, Attorney Ghaner, Ms. Parks gave further detail about I.M.R.'s cognitive issues and daily life.

Q: Ms. Parks, Mr. Kipphan asked you about cognitive disabilities. What sort of shortcomings do you see Iva having?

A: She does not remember—you know, you can say something to her and within a half hour she don't remember what you've told her. Very often she has said about people out in the trees fighting. She had said about people being there that I know that wasn't there. She's very hallucinating.

Q: Can you have a normal conversation with her like you and I are having right now?

A: You can but then she steers off and she has no idea what she's talking about.

Q: She gets confused?

A: Very easy.

Q: Does she forget things during the conversation that you—

A: Yes.

Q: Does she forget things like whether or not she's eaten that day?

A: Yes, she has.

Q: Does she forget whether or not she's had her medications those days?

A: No. She does remember she takes her medicine because every time I've went out, I've asked her, have you taken your medicine and she's always said yes. When I woke up, you know, it was on the table. I took it. She always tells you exactly how many pills she took.

Q: Where was she residing when you were providing care for her?

A: She lived in the home with [Petitioner]. She had a bedroom there. When I would go in, if she wasn't sitting at the table, she was usually in her bed

Id. at 15–16.

f. Cross-examination of Ms. Parks by Petitioner's counsel did not reveal additional significant details. Ms. Parks did clarify that she had begun

8

working for Petitioner in March of 2021, had begun caring for I.M.R. after I.M.R. had come from the hospital, and that Petitioner had had another person coming in to help I.M.R. for a short time after she first came home from the hospital. With regard to the condition of the home, Ms. Parks said that she had mentioned to Petitioner about cleaning the house, and specifically the kitchen, on a few occasions, and in response Petitioner had asked his mechanic to vacuum, and Ms. Parks to wash the dishes. Id. at 17–23.

g. At the outset of her testimony, Ms. Parks indicated that she was concerned about the potential for retaliation from Petitioner. Id. at 10. Her demeanor reflected that.

12. Next to testify was Brenda Hughes, a Protective Service Worker for the Agency. Ms. Hughes testified that I.M.R. first came to the attention of the agency via a report from the Pennsylvania State Police on September 13, 2021, after an incident in which I.M.R. had been found wandering down the road by a stranger and transported to the Huntingdon PSP station.

> She was unable to state her name. She was saying she did not want to live with her son. She also said she was headed to New York. There were also concerns about, you know, home conditions, exploitation, that she's alone for long periods of time and the son would not go pick her up at the police station.

Id. at 24. Eventually arrangements were made that day for Ms. Parks to pick up I.M.R., spend the day with her, and then take her home.

13. Ms. Hughes when to Petitioner's home the next day to interview him and I.M.R., and to observe the conditions there. To say the visit was not successful would be an understatement.

Q: What investigation did you undertake based on the report of need?

A: What investigation?

Q: Did you interview—

A: I did a face-to-face visit.

Q: With Iva?

9

A:     Well, unfortunately I couldn't meet with Iva alone. Mr. Cardwell would not allow that.

Q:     Did you ask to meet with Iva alone?

A:     Yes, I did.

Q:     Did Mr. Cardwell refuse that?

A:     Yes, he did.

Q:     Did he tell you why you were not allowed to meet with her alone?

A:     No. He just said that's not going to happen.

Q:     So when you met with her it was—

A:     With him.

Q:     —with him. And what was the outcome of that meeting?

A:     Well, she had acknowledged that she took a walk the other day, the day before, and she had said she was going to see her sister in New York. And then she also said that she was going to go to the hospital and I asked was she not feeling well and she said no, that she wants to go to a nursing facility because she can't take care of herself and needs help.

*** 

Q:     Were you able to observe Ms. Roush's ambulation?

A:     No too much, no. I mean, she came out to the porch. She was using her walker I believe.

Q:     Did you also ask to see the home?

A:     I can't say as I got that far. He was being so resistive, I wasn't pushing it any further.

Q:     Was he being intimidating?

A:     Yes, not only to me but also to Mrs. Roush.

THE COURT:     What do you mean by that? Can you describe that? You say he was being intimidating to Ms. Roush.

THE WITNESS:     Well, when she said about wanting to go to the nursing facility. He said, you don't want to go

10

> to a nursing facility and you have no money. You only get Social Security and who's going to visit you in the nursing facility and you don't know anyone in the nursing facility and what about your cat?

Id. at 25–27.

14. With respect to Petitioner's statements to I.M.R. that she "has no money," the Agency had conducted an investigation of I.M.R.'s financial situation as best it could with the records it had been able to access using the Records Petition. That investigation gave significant cause for concern regarding the possible dissipation and misappropriation of I.M.R.'s assets by Petitioner. Per Ms. Hughes's testimony, I.M.R. had realized $500,000 in income or assets in September 2018, yet by October 2021 she had less than $2,000 in her bank account (which was a joint account with Petitioner). That was the same account that her monthly Social Security payments were directly deposited into. Id. at 27–28.

15. Ms. Hughes had significant concerns regarding I.M.R.'s safety in the home, based in part on the reports from Ms. Parks, but also on statements made to her by Petitioner. When she raised the issue of the walkaway incident, "[h]e didn't seem to think it was a big deal. He said she had a destination in mind. She was going to New York." Id. at 29. More concerning was the following:

> Q: Following the incident in which Ms. Roush wandered from the home, did Mr. Cardwell tell you that his cure was to lock her in the house when he was gone?
>
> A: Yes.

Id.

16. In addition to her testimony regarding Petitioner's demeanor during her attempt to interview I.M.R., Ms. Hughes testified regarding actions taken by Petitioner to hamper her investigation into the matter generally.

> Q: It's my understanding that Ms. Roush has a sister, is that right?
>
> A: That's what I'm told, yes.

11

Q: Did you ask Mr. Cardwell for the name and address and phone number of the sister?

A: Yes.

Q: She would be entitled to notice of today's hearing, isn't that right?

A: Well, as a sister, sure.

Q: Did Mr. Cardwell give you that information or did he refuse it?

A: He refused.

Q: Did you ask him on more than one occasion?

A: Yes.

Q: On each occasion did he say you can't have it?

A: Yes. And a second time he told me it's none of my business.

Q: **Did he also tell you not to come back to the house?**

A: **I can't say that but I certainly got that message.**

Q: Has Mr. Cardwell provided you with any medical or, I'm sorry, financial information?

A: No.

Q: Now I understand that there's a trust, Iva Roush income only trust?

A: Yes.

Q: Have you been given a copy of that?

A: No.

Q: Are you asking the Court today to direct that the Agency receive a fully executed copy of that trust?

A: Yes.

Id. at 30–31 (emphasis added).

17. The lack of financial information for I.M.R., along with the highly suspect nature of transactions involving her property, rendered her ineligible at

12

that time for medical assistance to pay for the care she needed. That ineligibility could also extend for five years into the future.

Q: Why was it so difficult to get Ms. Roush approved for medical assistance?

A: We still don't have her approved. It's so difficult because of the property that was sold for $250,000 in January of 2020, so the County Assistance Office is going to look at that as a sold asset and actually it was sold under fair market value. It's actually 280-something thousand dollars and so because that's within the past five years, she's going to have a period of ineligibility.

Q: So you're talking about the five year look back that Medical Assistance employs to determine if you're eligible for nursing care, is that right?

A: Yes.

Q: And as we stand here today she's not qualified because of all the stuff that's gone?

A: More likely than not, no. I don't have the official word but I know that they have the five year look back and she's got well over the $8,000 limit that is a criteria for their program.

Id. at 39–40.

18. Petitioner's cross-examination of Ms. Hughes primarily focused on matters such as the fact that the Agency was relying on Ms. Parks' testimony regarding conditions inside the home, and that Ms. Hughes had only been out to the home twice (on September 13th and December 6th). Pertinent matters that came out during her cross-examination were that the Agency had been trying to obtain bed space for I.M.R. since the September incident, but had been hampered initially by Petitioner's refusal to provide financial records, and then by the fact that on paper, it appeared that I.M.R. should have significant assets (meaning that medical assistance funding was not available to pay for her care).[4] Overall, Petitioner's cross-examination

---

[4] Petitioner's counsel raised an allegation that Petitioner had asked the Agency for help in March 2021, but had been refused, insinuating that they would not help when asked, but then turned around and went after

amounted solely to an attack on how the Agency proceeded. It raised no matters that contradicted the evidence presented or weakened it to an appreciable degree. Id. at 31–40.

19. To follow-up on Ms. Hughes's testimony regarding I.M.R.'s finances, the Agency presented the testimony of Caroline Burnell, an expert witness in the field of financial fraud examination. Based on the records that the Agency had been able to obtain using the Records Petition, as well as publicly available land records, it was Ms. Burnell's preliminary opinion that: (i) there was at least $200,000 of I.M.R.'s funds not accounted for; and (ii) the records showed potential financial exploitation of I.M.R. of between $200,000 and $500,000. Id. at 40–43.

20. Ms. Burnell further opined that, based on the information she had at that point, I.M.R. had been a victim of financial exploitation. She based this primarily on her findings with respect to two joint bank accounts held by I.M.R. and Petitioner. Id. at 44–45.

    a. The first was a checking account with M&T Bank. It was opened in March 2018 and closed in November 2018. Reviewing the transaction history, the withdrawals attributable to Petitioner exceeded the amounts deposited by him by about $61,000. Even taking into account roughly $6,000 of deposits that could not be directly attributed to either account holder, the excess amount taken by Petitioner was $55,000.

    b. When the M&T Bank account was closed in November 2018 it had a balance of $180,000. That amount, which was all the proceeds of a life insurance policy that paid out to I.M.R. after her husband passed away, was deposited into a new account at Members First Federal Credit

---

Petitioner. Petitioner later raised this allegation multiple times in his own testimony in an attempt to cast the Agency in a poor light. Pet Ms. Hughes's testimony, what actually happened was that when I.M.R. was released from the hospital, the Agency was tasked with performing an evaluation to see what care she might need. This is done for all elderly persons similarly situated in the Agency's service area. However, the actual investigation and eligibility determination are performed by a broker working on contract funded by the Pennsylvania Department of Aging. This meant that once the Agency obtained the initial information, the matter was out of its hands. Id. at 34–35. The Agency therefore had no information about what might have transpired between Petitioner and the broker.

14

Union the same month. By the end of February 2019 the balance of the account had been depleted to $27,000.

21. Ms. Burnell made clear that her report was preliminary, and that it was based on the limited information that the Agency had been able to obtain. "If a report is needed for a final guardianship hearing, then I will obviously do additional work." Id. at 46.

22. Petitioner's cross-examination of Ms. Burnell proceed in a similar fashion as for Ms. Hughes. Petitioner's counsel questioned Ms. Burnell's methods, reliance on incomplete data and information (i.e., less than the full and complete bank records, which Petitioner had impeded access to), and reliance on information from the Agency, but raised no issues that contradicted Ms. Burnell's conclusions or appreciably weakened the strength of her testimony. Id. at 46–50.

23. The final witness for the Agency was Lori Heaton, Service Director. Ms. Heaton's testimony focused on: (i) Petitioner's conduct in impeding the Agency's investigation of I.M.R.'s case and preventing access to I.M.R.; and (ii) Petitioner's conduct in harassing and intimidating the Agency and its employees. Id. at 51–57. She also discussed the steps taken by the Agency to try to obtain appropriate care for I.M.R., which were met with resistance by Petitioner. Id. at 53–54.

24. Ms. Heaton became directly involved in the matter on December 2, 2021, when she accompanied another Agency employee on an attempt to visit I.M.R. and interview her at Petitioner's home. The visit itself was uneventful; however, Petitioner's actions afterward were troubling, to say the least.

> Q: Can you give us some details about the [level of Petitioner's] cooperation [in the case]?
>
> A: Yes. Again all during the case I had been hearing about the difficulties and cooperation by Mr. Cardwell but on December 2nd I went out to the home along with Belinda Black to try to see Iva and she was not home. We did speak with his mechanic, Mr. Cardwell's mechanic, Bill.

15

He tried to reach Mr. Cardwell but was unable to. So we returned to the office.

When I returned to the office I had a very angry voicemail message from Mr. Cardwell telling us that we had no business stopping by the home and to never do it again and that if we wanted to—anything from him, we were to mail it in writing to a Chambersburg address. Subsequently he then called the office again and I spoke with him over the phone and again he was very angry, threatening me that we should never come back to the home again; that it was not necessary. I told him that we just wanted to visit Mrs. Roush, discuss the case further, talk about any needs that she had and he said that it was not necessary.

\*\*\*\*

Q: Is there anything you would like to add about cooperation with Mr. Cardwell?

A: Just that there has been several instances of phone calls from him demanding to know the worker's full names. You know, it just seems to serve no other purpose but to harass, be menacing. He's accused they did not have their proper ID, which is not true, and—

Q: After the emergency guardianship was filed, did Mr. Cardwell file a right to know demand?

A: Yes.

Q: Listing dozens and dozens of requests for information?

A: Yes, yes.

Q: **Do you believe that was in retaliation for your actions?**

A: **Yes, I do.**

Id. at 52, 54 (emphasis added).

25. On cross-examination, I.M.R.'s counsel obtained clarification about the right-to-know requests, which included five (or more) years' worth of records pertaining to how many people the Agency had removed from their homes, the salaries of all Agency employees, all complaints that have been filed against the Agency, drug testing and criminal background check

16

results for all Agency employees, sources of funding for the Agency, and what legal authority the Agency has to do emergency guardianships. Id. at 56. Ms. Heaton also provided further information regarding her communications with Petitioner.

> Q: How many times have you interacted with Mr. Cardwell?
>
> A: Five to six times actually verbally over the phone and then we had several email exchanges.
>
> Q: Have you—maybe close to ten times?
>
> A: Yes, or more.
>
> Q: You have been doing this [work] for almost 30 years. Those ten times you interacted with him, how many of those was he helpful?
>
> A: Less than half.
>
> Q: **How many of those was he focused on what was best for his mother?**
>
> A: **In my opinion none. He did verbalize that he was concerned that she belonged with him and not in a nursing facility. In fairness I will say the one time that I did feel that he had a true concern was that he wanted to make sure that her healthcare directives were followed.**

Id. at 57 (emphasis added).

26. Clarification questions from the Court revealed the extreme nature of Petitioner's actions toward the Agency.

> THE COURT: Ms. Heaton, were you able to get into the home or were you allowed access to Ms. Roush?
>
> THE WITNESS: No, we weren't.
>
> THE COURT: What had to happen to get access to Ms. Roush.
>
> THE WITNESS: We had to get a Court Order.
>
> THE COURT: Typically in these situations when you come to me with an emergency, an Order is signed and then you do what you have to do?
>
> THE WITNESS: Yes.

17

THE COURT:      Was this different from most situations?

THE WITNESS:    Yes.

THE COURT:      Why?

THE WITNESS:    We were very concerned about the safety of our workers, so we had to ask the police to accompany us.

THE COURT:      And that accomplished what you needed to accomplish?

THE WITNESS:    Yes, it did.

Id. at 55.

27. Petitioner offered the testimony of himself in rebuttal of the evidence presented by the Agency. Due to the allegations of financial exploitation that were raised, as well as the presence of representatives of the Huntingdon County District Attorney's Office and two criminal investigators from the Pennsylvania State Police in the courtroom, the Court gave Petitioner the opportunity to meet with counsel to discuss whether to testify, and then conducted a brief colloquy on the record to confirm that Petitioner both understood his Fifth Amendment rights and that the testimony he gave could be used against him in a criminal prosecution. Petitioner confirmed that he understood his rights and the possible risks involved, and that he still wanted to testify. Id. at 64–66.

28. Petitioner's testimony on direct examination was troubling, and, at times, bizarre.

29. Petitioner had been caring for I.M.R. for ten years. He originally was caring for both his parents, and they were living at their farm in Dauphin County. His father (I.M.R.'s husband) passed away in 2018, and at some point after that, he had moved I.M.R. in with him at his home in Huntingdon County. I.M.R. had been living with him for between two and one-half and three years. Petitioner and I.M.R. met with Attorney O'Toole, and she signed the Alleged POA, after Petitioner's father died. Id. at 67–68.

18

30. Petitioner claimed that I.M.R. had only recently been prescribed medication for Alzheimer's, which he then clarified as being "a couple of years." He did not believe that her condition had deteriorated that far. He characterized her as having "good days and bad days." He confirmed that she at times has trouble recognizing people. He described a good day as I.M.R. having a conversation with him and telling him the "years and dates of her sisters—she had 13 brothers and sisters." Id. at 68–69. He described a "bad day" as follows:

> A: Bad day. She has fits where she sees a naked person outside the house. Then you have to explain to her there's no naked people hanging outside your house and she's okay. Might argue with you some but she's okay.
>
> Q: Would you acknowledge what was testified to earlier about her visions of people in the trees?
>
> A: Yeah, that's—normally it happens with she gets a urinary tract infection is when it happens most of the time.

Id. at 69.

31. Per Petitioner, I.M.R. had been hospitalized at the beginning of the year for about a week, and when she was discharged he tried to get her into a nursing home in Carlisle. That did not happen "because we had something with the insurance where we were in the wrong county or something. I don't know." Id. at 70. The hospital did set up someone to come to the home three times a week for skilled care. He claimed that this continued for many months, until mid-summer, and that he had brought in Ms. Parks to supplement the skilled care providers. Id. When the skilled care ended it was only himself, his mechanic, and Ms. Parks who were providing care. He confirmed that Ms. Parks came to the home three days a week, her primary duty was to bathe I.M.R., and that he had her take care of I.M.R.'s other needs. Petitioner was very hands-off with respect to Ms. Parks's care for I.M.R. "She was never given a schedule. She was told to come out there three times a week, make sure mom got a bath and if there was anything

19

else that mom needed, let her do it. I mean, that's what I was paying her for." Id. at 72.

32. Petitioner's description of the daily routine was that I.M.R. would get up on her own, give herself a sponge bath, and then come out to the table for breakfast. He would make her something to eat and giver her her medications. If she'd been incontinent of herself overnight, he would clean her up. She would typically spend the rest of the day napping and playing with the dogs or her cat. She had previously spent a lot of time watching television, but that had tapered off. She did not know how to turn the television on herself. Id. at 72–73.

33. Petitioner claimed that I.M.R. was rarely left alone in the house. Either he or his mechanic would be in the house with her. But there were times that he had to go pick up a car or car parts and I.M.R. had been left on her own. One those days he would have Ms. Parks come twice or have a friend check in on her. Id. at 73–74.

34. Petitioner also claimed that he often took I.M.R. on errands and trips with him to buy car parts. He also would take her out to get her hair done or her nails done. Id. at 73–74.

35. Petitioner's description of the events of September 6th, when I.M.R. walked away and was picked up by PSP, was as follows:

> A:     She was mad at me because she wanted to go to New York.
>
> Q:     **What's in New York?**
>
> A:     **That's where our family is from. Mom likes to gamble, so we go up there to this place way up north. I got to think what the hell it is. It's a reservation casino thing up there she goes to. She'll spend eight hours sitting at a table. I actually have to tell the lady at the table to shut it down so she'll eat but she likes to do the gambling.** So we just had one of her brothers or sisters passed away, so she wanted to go up north, so we went up north but before I could do that she got mad because I told her I couldn't do it that day. She got—climbed a little fence. Started walking down the road.

20

Q: What little fence is that? Inside the house?

A: We got a fence so we can let the dogs out and they don't run off. So you can't come in the house that way. There's a fence like two foot, three foot high.

Q: Okay.

A: So mom crawled over the fence, decided to walk down the road. When she walked down the road, somebody picked her up. We only live on James Creek Road. We see maybe five cars a day down there.

Q: Were you home at the time?

A: No. I was getting groceries. Bill [Petitioner's mechanic] was home. Bill's the one that called me, said Bill, your mom walked off. Well, you know what happened. She walked down the road, somebody picked her up and dropped her off at the State Police. I call the State Police, alerted them before she even got there. She wasn't even there when I called them. While I was talking to him, she walked into the police station. Well, I was in Altoona. I called Bonnie [Parks]. Bonnie went and picked her up and brought her back home. Then the next day that lady [pointing at Ms. Hughes] showed up.

Id. at 75–76.

36. Much of Petitioner's testimony regarding his interactions with Ms. Hughes and the Agency focused on what he alleged were illegal or impermissible actions by them (matters which the Court ruled were not relevant to the question of the emergency guardianship). It did confirm, however, that he took an adversarial posture with the Agency from the very start.

Q: And do you recall at that time whether Ms. Hughes asked you to take a look around the house or to meet with your mom?

A: No. The conversation went pretty much like this. She come up on the porch. She said she'd like to talk to mom. I went and got mom, put her on the porch and she had a conversation, two minute conversation, with my mom and turned around and told me my mom needs to be in a nursing home. Then I asked her, I said, who are you to tell me in a two minute conversation with my mother she belongs in a nursing home? What qualifications do you

21

have? In fact, I said to her where's your identification because she by law–

THE COURT: Let's move on. I'm not concerned with that.

Id. at 77; see also generally id. at 77–78.

37. Petitioner claimed that he had no further interaction with the Agency until they showed up with the State Police on December 6th to take custody of I.M.R. Id. at 78. He addressed the financial issues in a superficial manner;

> Q: There's been some allegations about misappropriation of mom's funds. Is there anything that we[sic] to have to say about that here today?
>
> A: There's no misappropriation of mom's funds. Whenever mom or dad died, they were renting the farm out to $13,000. When I rented the farm out, she made $25,000. I put that in a trust fund and that goes into her money or into our bank account along with both of our social securities goes into the same bank account. We have the same bank account.

Id. at 79.

38. As far as his income, Petitioner claimed that he was retired or "semi-retired," due to having suffered some unspecified injury in 1991. He last worked in 2012. Id. at 68. He also claimed to be an expert in in-home care and the investigation of elder abuse.

> Q: Mr. Cardwell, prior to your retirement and/or disability, do you have any work history in the field of in-home care?
>
> A: Absolutely.
>
> Q: What is that?
>
> A: I used to be a contractor for the Office of Aging. I covered eight counties.
>
> Q: When you say a contractor, what do you mean?
>
> A: We did in-home care. I had a hundred girls working for me, so I'm very much aware of what's going on here.
>
> Q: How long did you work in that capacity?

A: Six years I think it was. In those six years I had two counties investigated and basically the Federal government came in and shut them down.

Id. at 80.

39. When Petitioner was asked by his own counsel about how I.M.R. was doing since having been placed in a nursing home (he had visited her the previous day), he had trouble focusing on his mother's overall condition, and focused instead on supposed shortcomings with both what the Agency had done and the quality of the home they selected. Id. at 80–82.

Q: Has she—do you know whether or not she's taking her medications or is receiving any kind of medical treatment that she may need?

A: Well, I—when I got to the nursing home—on the way to the nursing come I call the other Area of Aging and asked them the story on the nursing home. They told me they have Covid[sic] in the nursing home and they told me it was a the worst nursing in the county. They told me it had a one star rating and they're seriously understaffed. I asked lady[sic] at the nursing home or the Area of Aging would you put your mom there. She said absolutely not.

Q: Has your—how is your mom's condition? When's the last time you saw your mom?

A: Yesterday.

Q: How is her condition?

A: Good.

Q: Did she have any kind of, you know, infections or any kind of conditions? In good condition or no?

A: When I finally got to see my mom a week later, her nose looked like it was falling off her face. So I got the administrator and I asked them, what's this thing on her face and they told me it was a staph infection. She didn't have a staph infection when she left me but sure got one now. So—

Id. at 81–82.

23

40. Cross-examination of Petitioner by the Agency's counsel revealed more bizarre claims and information that was much more concerning than what came out in direct examination.

 a. Petitioner claimed to be unaware that I.M.R.'s physician, Dr. Sellers, had diagnosed I.M.R. with dementia in 2014 and had prescribed medication for the condition at that time. (This despite supposedly having been to every one of I.M.R.'s medical appointments since he began taking care of her in 2012.) Id. at 84–85.

 b. He could not provide a full name for I.M.R.'s sister, as he only knew her as "Aunt Suzy." He could not provide her address despite having been to her house "a hundred times." "Don't ask me where she lives. I can only drive there." Id. at 83–84.

 c. He did not dispute Ms. Parks's description of the interior of his home. He did, however, claim that she was a "cleaning freak." Id. at 86.

 d. He (unintentionally) confirmed that I.M.R.'s cat could be used as a source of leverage over her.

> Q: When your mom expressed some concern—strike that. Was your mom worried about what was going to happen to her cat if she went to a nursing home?
>
> A: **My mom's always worried about what happens to that cat. Everyday she wakes up I get a story about this cat.**
>
> Q: Did you tell her, quote, you should have fucking thought about that before you took off down the road and to the State Police?
>
> A: No.
>
> Q: You never said that?
>
> A: No.

 Id. (emphasis added).

 e. He admitted that his claim that the infection on I.M.R.'s nose was staph was false. He also (again, unintentionally) confirmed that his focus was on control of I.M.R., and not what was best for her.

Q: The staph infection that you indicated your mom has on her nose.

A: Yes.

Q: Isn't it true that the doctor there said it was cellulitis?

A: They told me it was a staph infection. I have not heard the terminology cellulitis until yesterday.

Q: Who did you hear it from yesterday?

A: The nurse.

Q: At the nursing home?

A: At the nursing home.

Q: So yesterday you were told it was cellulitis?

A: Yes.

Q: But today you're testifying it was a staph infection?

A: That's what I was told.

Q: By whom?

A: The coordinator up at the nursing home. **When I got to the nursing home, the first thing I did was went to the coordinator and he got the director of nursing and I handed them the power of attorney that I had which basically states everything my mom wants done. I told them Huntingdon doesn't recognize this power of attorney but everybody in the country does.** I said if I was you, I would get my mom evaluated because you just told me that this happened outside of your area.

Id. at 90 (emphasis added).

f. Petitioner confirmed that the copy of the Alleged POA that he had provided to his attorney and that had been filed with the Court, the same document he had represented to the Agency as giving him absolute authority over I.M.R.'s person and property, had not been executed by him as required for it to be effective. Id. at 90–91. The Court left open the possibility of Petitioner locating an executed copy. Id.

25

41. With respect to the misappropriation issue, Petitioner initially refused to discuss any specifics regarding finances without having bank records with him, claiming that he could not remember the details. For example, he initially claimed he didn't recall that I.M.R. received $250,000 from a life insurance policy after her husband died in 2018. Id. at 92. He then said that he was "aware of it." Id. His testimony was similar regarding $250,000 that I.M.R. had received from the sale of a property. He then went on to testify that he did not know how the money had been spent or where it was. He also (inadvertently) testified once again to the degree of control he had over I.M.R.

Q: Well, you do know or you don't know. As your[sic] power of attorney I would assume you would be on top of those things.

A: You're asking me. She's got it. If she got it, it's probably in the bank account and I probably either took it out for something or did something with it but she okayed everything that I've done.

Q: So it's still somewhere?

A: Probably.

Q: Are you handling her finances?

A: I paid her bills.

Q: You don't know where her money is?

A: I pay her taxes. I pay the bills and it comes out of my account and her account. They [I.M.R. and her husband] had separate accounts when they were married of when dad died. When all that took place, there was 60-some thousand dollars missing out of one of dad's accounts. It is what it is. I didn't have control over dad's accounts either.

THE COURT: When did your dad pass away?

THE WITNESS: I think it was—I want to say it's in the September range of 2018. He died at the house.

26

THE COURT: Was that before or after the power of attorney?

THE WITNESS: **After—no, I'm sorry. No, No. Yeah, it was after because before dad died I tried to get her to do a power of attorney on dad and I don't think she did. I don't think she did but at some point we had mom's name put on everything and at some point dad tried to get her to sign off on it and I told her no.** And then when dad died, she ended up with everything and then she told the attorneys that she wants to give me everything now while she's still alive.

THE COURT: When was that?

THE WITNESS: Back in 2018. That's when I put everything in a trust fund so that we—the income coming in from the house shows up as income and that's what's on the taxes every single year.

Id. at 93–94 (emphasis added).

42. Petitioner further revealed that his recordkeeping with regard to his joint account with I.M.R. was woefully inadequate, and that he considered all of her assets to be his.

Q: So right now she gets her Social Security?

A: Yes.

Q: And $25,000 a year, is that right?

A: Yes.

Q: She get any other income?

A: No.

Q: And her money goes into a joint bank account with you, is that right?

A: Yes.

Q: It would be safe to say that the balance of you account at least in October would have been a couple thousand bucks?

27

A:     I have no idea what my balance its. I'm 60 years old and I've never reconciled a checking account since then.

Q:     Would you know if it was a couple thousand versus a million?

A:     Probably because I get notifications that I got more than a thousand in my bank account. I don't keep money in the bank. I pull money in and out of banks all the time.

Q:     Do you keep your mom's money in the bank?

A:     **I pull money out all the time. Our money—it's our money. It is not my mom's money.** If mom needs something, I buy my mom whatever she needs. My mom's not wanting for anything.****

Id. at 95–96 (emphasis added).

43. Petitioner confirmed that there were ten dogs in the home. Id. at 96.

44. Petitioner confirmed that he contacted Attorney O'Toole for help with getting I.M.R. out of the Agency's custody as soon as she was removed from his home, specifically focusing on the Alleged POA.[5] Id. at 98.

45. At the close of the hearing the Court denied the petitions to remove the Agency as guardian of I.M.R.'s person and estate and to reconsider the appointment of the Agency as emergency guardian. The Court also stated on the record its limited reasons for denying the petitions, and that it believed I.M.R.'s dementia and need for care were sufficient to support the emergency guardianship.

THE COURT:     I appreciate the argument. However, under the circumstances based on the testimony that I heard I think there's more than enough to deny the emergency petition to remove the current guardian. I believe that Ms. Roush is at risk based on the testimony. I believe she has been at risk.

Again, I would imagine that the testimony will be developed further but I don't think there's any question that she has dementia. She's in a

---

[5] The Court notes that it did not allow further questioning or testimony on this issue given the possibility of privileged information being revealed. The fact that Petitioner did contact Attorney O'Toole is relevant, however, to the question of whether he should have been permitted to represent I.M.R.

> dementia unit now which I think is appropriate based on the testimony. It sounds as if she needs round the clock care. There's no evidence that round the clock care has been provided under the circumstances.****

Id. at 102–103.

46. The Court further ordered Petitioner to provided fully executed trust documents within ten days. Id. at 103.

47. Following the First Hearing, a full hearing on the Guardianship Petition was scheduled for February 1, 2022.

48. On January 13, 2022, Attorney O'Toole filed an emergency petition for leave to serve as legal counsel for I.M.R. That petition was incomplete, as it did not include an engagement letter as required by Pa.R.O.C.P. 14.4(b). The following day, the Court entered an order directing Attorney O'Toole to file a copy of the engagement letter as a confidential document and giving the other parties until January 21, 2022, to file any written responses to Attorney O'Toole's petition. After review of the then-existing record, the petition, and the response filed by Attorney Ghaner, the Court denied Attorney O'Toole's petition on January 24, 2022.

49. The second hearing in this matter (the "Second Hearing") occurred as scheduled on February 1, 2022.

50. The Agency presented the testimony of Dr. Brandon Michael Roscoe, Dr. Amy Sellers, Brittany Bacher, and Carissa Beish.

51. Dr. Roscoe is a primary care physician who specializes in geriatrics. He is an attending physician at Mountain[6] Laurel Healthcare and Rehabilitation Center in Clearfield, PA, the facility at which I.M.R. was placed after being removed from Petitioner's home. N.T., Second Hearing, at 6–7. He examined I.M.R. in that capacity upon her admission to the facility, and reviewed her medical records from before that time and those generated by I.M.R.'s treatment by other staff at the facility after admission. Id. at 7, 9–10.

---

[6] The hearing transcript continually refers to "Mount Laurel," but "Mountain Laurel" is correct.

29

He concurred with Dr. Seller's diagnosis of vascular dementia. Id. at 7. In his opinion, it "completely impairs her ability to function independently," rendering her in need of round-the-clock skilled care. Id. at 8. When asked about specific activities he opined that she would not be able to negotiate contracts, handle her own checkbook, administer he own medicines, cook her own meals, or regularly use the bathroom on her own. Id.at 8, 10–11. On cross-examination by Petitioner's counsel, Dr. Roscoe specifically referenced I.M.R.'s BIMS score. BIMS is a neurologic assessment tool used by the nursing facility, scored 0–15; 13–15 is normal, 8–12 is moderate cognitive impairment, and anything less than 7 is severe cognitive impairment. I.M.R.'s score was 6. Dr. Roscoe characterized this as "a profound deficit." Id. at 11. He further testified that the prognosis for I.M.R.'s vascular dementia is poor, with the condition expected to be progressive and worsening. Id. at 9.

52. Dr. Sellers is a physician in private practice in Harrisburg, PA, specializing in family medicine. She began treating I.M.R. in 2014 and continued as I.M.R.'s primary care physician until she was placed in the Mountain Laurel facility. Dr. Sellers first saw I.M.R. for "difficulty with her memory" after a fall. Id. at 14–15. Dr. Sellers first prescribed medication to treat her "memory difficulties" in December 2014, and, with, some changes in medication, she has been treated with medication for cognitive issues ever since that time. Id. at 15, 20–21. Although Dr. Sellers prescribed medication for I.M.R. in 2014, she did not diagnose her with vascular dementia at time; "The official diagnosis was made a bit later but it was mild cognitive impairment at that point that we were using the [medication] to treat." Id. at 20. Dr. Sellers confirmed that she personally prepared the form M-851 Physician's Statement Regarding Patient's Medical Condition and Capacity that was attached to the Emergency Petition. Id. at 27–28. She confirmed that I.M.R. needs round-the-clock nursing care, cannot live independently, and can only complete basic tasks such as getting food and going to the bathroom with assistance. Id. at 15–

30

16, 23–24. On cross-examination by Petitioner's counsel, Dr. Sellers characterized I.M.R.'s impairment as being milder than opined by Dr. Roscoe, repeating her "mild to moderate" characterization from the form M–851. Id. at 23, 27. Dr. Sellers also noted, however, that in addition to her baseline dementia, I.M.R. had suffered several instances in which "things flared" and she suffered "acute mental status changes." This was attributed to urinary tract infections and instances of TIAs or "mini-strokes." Id. at 29. The TIAs contributed to her vascular dementia. Id. Upon further questioning, Dr. Sellers noted that the acute mental status changes had led to multiple emergency room visits for I.M.R., and had been occurring "frequently." Id. at 30. She agreed with Dr. Roscoe that I.M.R.'s prognosis is poor and progressive. Id. at 16.

53. With specific respect to her knowledge of Petitioner and his relationship with I.M.R., Dr. Sellers first met him in 2017, when he began taking I.M.R. to her medical appointments. Id. at 22. She characterized I.M.R. as always being dressed appropriately and not appearing malnourished or neglected. Id. at 22–23. She noted that she had had discussions with I.M.R. and Petitioner sometime after I.M.R.'s husband died about the fact that I.M.R. could no longer live alone, after which I.M.R. moved in with Petitioner. Id. at 16. She had also discussed with Petitioner more recently that I.M.R. was now in need of round-the-clock care. Id. at 17–18. Notably, at a visit in April 2018[7] Petitioner asked Dr. Sellers about becoming a power-of-attorney for I.M.R. Id. at 18, 22.

54. Brittany Bacher is the Director of the Alzheimer's Unit at Mountain Laurel. I.M.R. was housed in that unit. Id. at 46. Ms. Bacher's testimony only briefly addressed I.M.R., whom she characterized as having taken some time to adjust to the transition before showing improvement, but generally doing well. Id. at 47. The focus of Ms. Bacher's testimony was on Petitioner's behavior at visits and his actions afterward. Petitioner's harassment and

---

[7] Dr. Sellers first testified that this occurred in April 2019, but then consistently referred to it as occurring in April 2018 in all later testimony. See id. at 18, 19, 22.

31

intimidation of Mountain Laurel's staff matched that he had committed against the Agency. He had repeatedly photographed and videoed staff, continuing to do so after being directed to stop. He was loud and disruptive during visits, to the point that he upset other patients. He repeatedly threatened to sue Mountain Laurel and its staff. He subjected multiple staff members to questioning and caused a scene if any of them answered differently than the others. He claimed that the Alleged POA trumped the orders of this Court. He told Ms. Bacher that he was placing pennies on the floor to see if the facility was being cleaned, and then the next day reported Mountain Laurel to the Department of Health. (The resulting investigation was returned "unfounded.") Petitioner complained that he had taken the wedding ring off I.M.R.'s finger and no staff members had noticed. Ms. Bacher personally witnessed Petitioner eating food off of I.M.R.'s tray and had to "redirect" him not to do so. And she had witnessed him intimidating I.M.R., pressuring her to change her drink selection ("[H]e told her no. You don't drink that. You drink the other one.") Id. at 48–50. These actions had led the Agency to suspend Petitioner's visits with I.M.R. Id. at 48.

55. Carissa Beish is the Director of Nursing Services at Mountain Laurel. She was familiar with I.M.R. and, similar to Ms. Bacher, characterized I.M.R. as having adjusted to the transition and doing well. Id. at 57–58. Also as with Ms. Bacher, the focus of Ms. Beish's testimony was Petitioner's behavior at the facility.

> Q: Do you recall an event at your facility during which Mr. Cardwell was yelling in Iva's room and Iva's roommate pleaded for the yelling and fighting to stop?
>
> A: Yes.
>
> Q: Is it fair to say that your facility isn't equipped to handle that kind of behavior by visitors?
>
> A: Correct.

Id. at 58.

56. On cross-examination by Petitioner's counsel, Ms. Beish testified that she had been made aware of Petitioner photographing staff, including while staff was providing care to I.M.R. in her room, and that Petitioner had made "numerous" and "frequent" complaints regarding the cleanliness of the facility and alleged noncompliance with COVID-19 infection management protocols. Id. at 59–63.

57. Petitioner presented the testimony of Dr. William Kauffman. Dr. Kauffman practices in the hospice and nursing home setting, and was previously engaged in family practice. Id. at 35. He was originally presented to the Court as having been a treating physician for I.M.R. He was accepted as a witness on that basis, and not as an expert. Id. at 36. However, it soon became apparent that I.M.R. had never been a patient of Dr. Kauffman (he characterized it as "[n]ot officially a patient"). Id. at 36, 43. Instead, Dr. Kauffman knew Petitioner as both a patient and a friend. In fact, they had known each other for 30 years. Id. at 36, 44. Dr. Kauffman had been contacted by Petitioner, given Petitioner's version of events, and was testifying as a favor to him. Id. at 44.[8] Dr. Kauffman had last seen I.M.R. in March 2021 when she was hospitalized in Carlisle, and presumably had checked in on her as a favor to Petitioner. Id. at 37. The primary thrust of Dr. Kauffman's testimony was to dispute the severity of I.M.R.'s cognitive impairment as characterized by Dr. Roscoe. Dr. Kauffman was skeptical of the BIMS score, which he alleged could vary day-by-day, and the fact that Dr. Roscoe did not evaluate I.M.R. multiple times, because her level of

---

[8] See id. (cross-examination by the Agency's counsel).

Q: ***And so, Doctor, your attendance here today, is that as a favor to Mr. Cardwell? Are you being paid to be here today? Is it an accommodation? Can you help me do that?

A: I am not being paid.

Q: Okay, sorry.

A: No, that's okay. So he and I talk—we get together maybe four times a year because we have a hobby in common, so we get together for dinner about four times a year and so when he told me what had happened and it did not make a lot of sense to me, I said I was happy to help out if I could.

cognitive impairment could also vary day-to-day and would have been exacerbated by the move into the nursing home. Id. at 39–40. However, he also confirmed that beyond the BIMS score, he had no reason to disbelieve Dr. Roscoe's findings regarding I.M.R. nor Dr. Roscoe's ultimate conclusion that she was incapacitated. Id. at 40–41.

58. Due to time constraints, the Second Hearing was adjourned, with the remainder of the testimony to be presented on February 8, 2022. Id. at 67.

59. Two days after the Second Hearing (February 3, 2022) Petitioner filed a motion *in limine* seeking to have all medical and financial records obtained by the Agency excluded from evidence. The basis for the motion was that the Records Petition had been wrongfully granted *ex parte*, without notice to I.M.R. and Petitioner. In essence, Petitioner was making a "fruit of the poisonous tree" argument, claiming that the alleged impropriety with respect to the information obtained via the Records Petition extended across the entirety of the Agency's case, and significantly prejudiced both I.M.R. and Petitioner.

60. The final hearing was held as scheduled on February 8, 2022 (the "Third Hearing"). The Court began by hearing argument from counsel for all of the parties regarding the motion *in limine*. N.T., Third Hearing, at 1–9. While the Court agreed with Petitioner's counsel that the Records Petition should not have been granted *ex parte*, citing In the Interest of M.B., 686 A.2d 877 (Pa. Cmnwlth. 1996), it did not agree that significant prejudice had occurred, nor that the proper resolution was to exclude all of the Agency's evidence. Rather, the Court denied the motion, citing the facts that: (i) even without the evidence obtained using the Records Petition, the remaining evidence in the possession of the Agency at the time the Emergency Petition was filed was sufficient to grant the emergency guardianship; (ii) the Agency would have obtained all of the records at issue as a result of the emergency guardianship (i.e., inevitable discovery); and (iii) Petitioner did not have an interest in protecting the records, as that interest belonged to I.M.R. N.T., Third Hearing, at 10–11.

34

61. Petitioner's counsel specifically raised the question of why Attorney Ghaner, as counsel for I.M.R., had not joined in the motion *in limine* in order to protect I.M.R.'s rights. Id. at 2. Attorney Ghaner first noted his concern that the motion *in limine* appeared to be an attempt by Petitioner to use I.M.R.'s rights as a shield to protect himself. Attorney Ghaner then explained his reasoning for not joining the motion *in limine* as follows:

> Moreover, Your Honor, and factually specific to this, I have met with my client two times at length because of the controversial nature of this specific guardianship. I spent an extended amount of time with her. And on neither of those occasions did she present as somebody who I believe would have the capacity to understand the argument that is being made and the records that were taken.

> So with that, I conducted some research and am led by Rule of Professional Conduct 1.14 which directs that a lawyer when dealing with a client of diminished capacity, shall, as far as reasonably possible, maintain a normal client/lawyer relationship.

> That rule goes on to state that if the lawyer reasonably believes that the client is of diminished capacity and at a substantial risk of physical, financial, or other harm, then the lawyer can seek the appointment of a guardian.

> That is exactly why we are here. For the appointment of a guardian. There is an emergency guardian in place, which I believe is proper. And I will tell you whenever I'm called upon, that based on lengthy discussions with Iva, that a guardian is needed.

Id. at 8, 9.

62. The Agency presented further testimony from Ms. Burnell and Ms. Heaton.

63. Ms. Burnell's testimony was in follow-up to her original testimony regarding financial exploitation of I.M.R. by Petitioner from the First Hearing, as she had been able to review "many hundreds of pages of bank documents" as well as other items in the intervening time and had prepared a final report. Id. at 14–16. Although Ms. Burnell did not provide a final number for the amount of misappropriated assets, she noted a number of transactions and occurrences that totaled hundreds of thousands of dollars,

and which led her to the conclusion that financial exploitation had been substantiated. Id. at 23. These included:

a.  The assets that were to have been transferred into the income-only trust for I.M.R. were not the properties actually transferred into it. The properties that had been transferred into it were sold in January 2020, with no indication of what happened to the proceeds. Although it appeared that they had been placed in the joint account between I.M.R. and Petitioner at Members First Bank, there was, at most, only $103,000 of those assets remaining. Id. at 17.

b.  Also with respect to the Members First account, in November 2018 $180,000 of I.M.R.'s money had been transferred into that account. By March 2019 very little of those funds were left. The funds were spent in a way that both violated the Multiple Parties Account Act and that would penalize I.M.R. in terms of eligibility for medical assistance, including $81,000 that was withdrawn in cash, $41,000 paid to vendors who were not identified or who could not be identified in terms of the services they provided, and $18,000 paid to vendors dealing in automotive repair and restoration, including painting and transportation. Id. at 18.

c.  Payments that were received from a Darren M. Weaver/Weaver Family Farm, which appeared to be ground rent paid for the use of property owned by I.M.R. and payment for property of I.M.R. that was sold to Mr. Weaver, had been made via check payable to Petitioner and deposited in the joint account, rather than the trust. The ground rent payment was for $24,800 and the other check, the purpose of which could not be definitively identified, was for $363,700. Id. at 20–21.

d.  Because the property that had been held in the trust was sold to Mr. Weaver for $250,000, the $363,700 check raised the possibility that Petitioner had arranged some sort of installment sale of the farm still owned by I.M.R. to Mr. Weaver. That farm had a value of approximately $800,000, and was the only significant asset I.M.R. had remaining. Id. at 21–22.

36

64. In addition to the bank and land records, Ms. Burnell had reviewed the Alleged POA and the trust document for the Iva M. Roush Income-Only Trust. The Alleged POA included a provision that I.M.R. has an interest in receiving medical assistance; the trust document includes a similar provision. These provisions both authorized the holder of the property or power to undertake actions that would hasten or facilitate such eligibility for I.M.R. However, even if the transactions undertaken by Petitioner were claimed to be a "spend down" of assets so as to hasten such eligibility, none of them had that effect. In fact, they had just the opposite effect, potentially rendering I.M.R. ineligible for up to five years into the future. Id. at 16–17, 18, 19–20.

65. On cross-examination by I.M.R.'s counsel, Ms. Burnell confirmed that the copy of the Alleged POA she had received had not been signed by Petitioner. She also confirmed that it contained language requiring Petitioner to act in I.M.R.'s best interests. Id. at 40-42.

66. Ms. Heaton's testimony was limited to the issues regarding Petitioner's visits to I.M.R. at the Mountain Laurel facility that had been raised at the Second Hearing, and specifically with respect to the Agency's suspension of Petitioner's visiting privileges.

    a. Not long after I.M.R. was removed from Petitioner's home he contacted Ms. Heaton asking her where I.M.R. was and requesting to visit I.M.R. Ms. Heaton agreed to provide this information and allow visits so long as Petitioner agreed to comply with rules established by the Agency for visitation. Those rules were laid out in an email Ms. Heaton sent Petitioner on December 10, 2021. The rules included that Petitioner would follow the rules and protocols of the facility regarding COVID-19; that he understood that he was not to remove or attempt to remove I.M.R. from the facility; that he would not "engage in contentious behavior with facility staff"; and that he would "not speak with Mrs. Roush in an intimidating tone or upset Mrs. Roush in any way during the visit." Id. at 45–46. After some back and forth regarding

37

visiting hours, Petitioner agreed to the rules via email on December 13th. Id. at 46.

b. Problems with Petitioner's behavior at Mountain Laurel began almost immediately. On December 15th, the Agency received its first call from the facility regarding Petitioner's behavior there. Between December 15, 2021, and January 13, 2022, Ms. Heaton received 11 separate reports from the facility regarding Petitioner's behavior and actions. The issue was significant enough that the Agency was in danger of losing the placement for I.M.R., as the facility was prepared to discharge I.M.R. if the behavior continued. As a result the Agency, both of its own volition and on the request of the facility, suspended Petitioner's visiting privileges. Id. at 47–48. Ms. Heaton noted that before this action occurred, she had communicated with Petitioner's counsel regarding the issue, but that no change in Petitioner's behavior and actions resulted. Id. at 48.

c. Ms. Heaton further testified that in her roughly 30 years of working for the Agency, she could only recall suspending visits for family members in two or three cases. She concurred that it was a "pretty severe action" to get to that point. Id. at 48–49.

67. Cross-examination of Ms. Burnell and Ms. Heaton by Petitioner's counsel mirrored what occurred at the First Hearing. Ms. Burnell was repeatedly questioned about the sufficiency of her methods and the information she reviewed as well as her conclusions that the Alleged POA and trust document did not permit Petitioner to make unfettered use of I.M.R.'s assets for his own benefit. Id. at 24–38. Ms. Heaton was questioned regarding the sufficiency of the Agency's communications with Petitioner prior to the removal of I.M.R., the sufficiency of its actions with respect to suspending visits and not providing alternatives such as video calls, the quality of the Mountain Laurel facility, and the timeliness of a notification to Petitioner regarding a "lump" that had been discovered on I.M.R.'s armpit. Id. at 59. Nothing raised on cross-examination weakened the Agency's evidence, and

38

at times it strengthened it (including with respect to the unreasonableness of Petitioner's demands and behavior).

68. Petitioner presented the testimony of Terry Lynn Lumbard-Monnat, Valerie Scott, and himself.

69. Ms. Lumbard-Monnat is I.M.R.'s niece and Petitioner's first cousin. She lives in New York state and has a cottage in Black Lake, New York. Her testimony focused on I.M.R.'s cognitive capacity, the relationship between I.M.R. and Petitioner, and I.M.R.'s condition while in Petitioner's care. She had last seen I.M.R. in September 2021 when they came to her cottage for a weeklong visit. She characterized I.M.R. as having dementia but being able to care for herself, dressing herself and using the bathroom unassisted. Id. at 61, 62–63. Per Ms. Lumbard-Monnat, I.M.R.'s mind is still sharp when it comes to playing games, and she and Ms. Lumbard-Monnat played games nightly. Ms. Lumbard-Monnat noted multiple times that I.M.R. likes to gamble and go to the casino. Id. at 61, 63, 65. She also discussed the extent to which I.M.R. and Petitioner would gamble.

> Q: You said that Iva likes to gamble. Was that always at the house or would you go to casinos?
>
> A: **We would frequent a casino when we were together.** We have been to The Turning Stone. We have been to Akwesasne. **I wouldn't stay as long because Iva and Bill like to gamble. My aunt more so than him. She would sit there for hours and hours and hours.** I also work for the federal government, so I didn't spend money the way they did. **I would limit myself to maybe $500. They would bring in thousands.**

Id. at 65 (emphasis added).

70. Ms. Lumbard–Monnat characterized the relationship between Petitioner and I.M.R. as "very good," and his care of her as "exceptional." Ms. Lumbard-Monnat emphasized that I.M.R. always had her hair done, her nails done, had on nice clothes, and that Petitioner took her out to eat and out shopping all the time. Id. at 64, 65. When questioned further about I.M.R.'s mental capacity, though, Ms. Lumbard-Monnat noted that a lot of

their conversations focused on past events, such as I.M.R.'s childhood and family. Id. at 61, 63.

> Q: How was her conversation? Could she hold a conversation and understand what you were saying, make sense?
>
> A: Her conversation is limited. My aunt likes to talk about her childhood upbringing. Bill and her. We would talk about going to the casino. Not a normal conversation you would have about what is going on, you know, in the world, no.

Id. at 63.

71. Valarie Scott is another of I.M.R.'s nieces, first cousin to Petitioner, and also lives in New York. Her testimony was largely irrelevant. The relevant portions, though, mirrored Ms. Lumbard-Monnat's. Specifically, Ms. Scott lives in New York, had last seen I.M.R. when she and Petitioner visited in September 2021, downplayed the degree of I.M.R.'s cognitive impairment, believed that I.M.R. could largely take care of herself, and noted how close Petitioner and I.M.R. had always been. Id. at 68–69, 70–72, 75–76. She also noted I.M.R.'s skill at card games.

> Q: Tell me a little bit about her demeanor, her well-being?
>
> A: She was fine. She doesn't change. I'm the one who calls her on a regular basis. I have always done that. She has always been with us. She slowed down like anybody does at her age, but she is still able to walk around and join everybody, and she is a whiz at cards. She is pretty sharp.

Id. at 71.

72. After discussion with his counsel over the lunch break, Petitioner once again elected to testify. Id. at 77–79. Much of his testimony on direct examination was a repeat of his testimony at the First Hearing, at times with more detail and at times with less, but with the same tone and demeanor. He did make, however, yet more troubling admissions regarding his handling of I.M.R.'s finances.

40

a. Petitioner confirmed that he, I.M.R., and his mechanic lived in the home at 3916 Tussey Lane in the James Creek area of Huntingdon County. However, he also claimed that they did not have a mailbox there as they considered it a "cabin," and not a residence. He maintained that I.M.R.'s residence was at the farm in Dauphin County (4206 Roush Road), and he consistently gave a Franklin County mailing address for himself, which he later admitted was nothing more than a UPS box. Id. at 80, 85–86, 129–130. He faulted the Agency for attempting to send notices to the home in Huntingdon County, as opposed to the out-of-county addresses. Id. at 85.

b. Petitioner once again railed about the Agency, accusing it and its staff of multiple wrongdoings. Id. at 84–91.

c. Petitioner testified that he had done extensive work to his home since I.M.R. had been removed to make it handicapped accessible for her, and that such work had been planned prior to the removal (this was also raised at the First Hearing). He believed this made his home an entirely appropriate and safe place for I.M.R. Id. at 92–95.

d. He made extensive allegations of poor conditions and neglectful care at the Mountain Laurel facility. Id. at 95–102. Yet he also confirmed that he began making complaints to the facility administrator right away, focused excessively on the cleanliness of the floors, and had been taking pictures in the facility. Id. at 97, 99–100, 102–103. This testimony also confirmed his absolute disregard for authority.

> Q: After you were told to leave the facility and that you were no longer welcome back, did anybody reach out to you to try to arrange any other form of communication like telephone or video?
>
> A: No. **That's when I told you to get a hold of somebody because they can't stop me from seeing my mom. I don't care who they are.**

Id. at 103 (emphasis added).

e. Petitioner confirmed that I.M.R.'s only sources of income were rental from the farm in the amount of $25,000 annually and Social Security payments of $1,375 monthly. Id. at 106.

f. After I.M.R.'s husband died in 2018, her land assets included the core family farm (128 acres in Dauphin County) and an unspecified number of properties in the surrounding area. Petitioner testified that at that point I.M.R. gave him all of the properties. Id. at 107. He then sold all of the properties other than the farm, because the farm was generating income, and claimed that he had put the farm into the income-only trust for I.M.R. He claimed that doing this allowed himself and I.M.R. to avoid paying $375,000 in taxes. Id. at 107–108.

g. Petitioner confirmed that Darren Weaver was the person who was leasing the farm and who had purchased all of the other properties. Id. at 109.

h. Petitioner's testimony took a marked turn when he addressed the funds from the Members First Bank joint account.

> Q: From the—I believe it was just the Member's[sic] First bank account. What do you have to say in response to any of that [Ms. Burrell's testimony] as far as any kind of explanation?
>
> A: **Well, there is no explanation to it. All that money was put in that account belonged to me. My mom gave me all of that. That's why it's in there. The only income my mom has is $1357 in social security, and she has the $25,000 coming in from the farm.**
>
> Q: If there ever was a time mom needed long-term care and was unable to afford it—
>
> A: Never will my mom not afford anything. If she needs something, I provide for it.
>
> Q: Was there ever a time that mom was hospitalized and couldn't pay a hospital bill?
>
> A: No.
>
> Q: Was there ever a time that you didn't have enough money to pay for food or medicine or anything else?

> A: No. I have $40,000 in food at my house right now. I'm a preparer. I have got a building buried underground full of food. There is no way we're ever going to be without anything.

i. Id. at 110–111 (emphasis added).

j. Per Petitioner, when I.M.R. received the $250,000 check from her husband's life insurance policy, she simply signed it over to him and gave it to him. Id. at 112. Petitioner testified that he put the funds into the joint bank account, put I.M.R.'s name on the property in Huntingdon County, and then used the funds to build a 50x80x16 shop building and automotive paint booth on the property. He also testified that he put an addition on the house that doubled its size, but then clarified that this occurred after I.M.R. had been removed. Id. at 113.

k. Petitioner believed that the additions greatly improved the value of the property in Huntingdon County, and that it could be sold (along with other property he owns) if he ever needed funds to pay for I.M.R.'s long-term care. Id. at 114.

l. Petitioner closed his direct testimony with the following troubling admissions:

> Q: Anything in relation to mom's finances that we didn't cover here today that you want to make sure?
>
> A: No. Mom's finances are very simple. It's $1357 and $25,000 for farm rental. That's her finances. **So when they are confused about the money coming in and out of the account, it's very simple. The money going into the account is mine.** The money coming out of the account is $25,000 and $1357, which those are for her hair, to do her nails, doctor appointments. Whatever she needed is covered.
>
> Q: Is it true that mom liked to gamble as well?
>
> A: Oh absolutely. **I would take $10,000 out of the bank, and we would go to the casinos. That's why there is cash withdrawals all over the place.**

Id. at 117 (emphasis added).

43

73. On cross-examination by the Agency's counsel, Petitioner exhibited a significant degree of confusion regarding what property was in the trust for I.M.R., swearing that he thought the farm was in it, but also claiming he had not transferred title to it. Id. at 119, 120. He claimed that he was given no explanation as to how the Alleged POA was supposed to work, and could not recall if he had ever signed it as I.M.R.'s agent. Petitioner went so far as to attempt to have his counsel answer whether there existed a signed copy of the Alleged POA. Id. at 120–122. He was unaware of any of the requirements for exercising a financial power of attorney, such as keeping separate accounts for his own and I.M.R.'s property, keeping records of all transactions, and fiduciary duties generally. Id. at 122–123.

74. Petitioner confirmed that the $360,000 deposited from Mr. Weaver was a loan to him, stating "I borrow money off of Weaver any time I want to." He claimed that there was no full agreement for Mr. Weaver to buy the farm, but that there was an option to buy in the lease agreement and "Weaver will probably end up with the farm because he bought all the rest of it." Id. at 126–127. Petitioner further confirmed that he believed the farm was in the trust, even though it was still held in the name of I.M.R. and her deceased husband. Id. at 128.

75. Cross-examination by I.M.R.'s counsel largely affirmed the testimony Petitioner provided the Agency's counsel. He once again confirmed that he did not have a copy of the Alleged POA that he had signed, this time claiming that he would have to call Attorney O'Toole. Id. at 131–133. He further claimed that he had done everything according to her wishes or in her best interest before providing the following testimony regarding the improvements to the Huntingdon County property.

> Q:  You testified that you built a 50 by 80 by 16 building?
>
> A:  Yes.
>
> Q:  On the property?
>
> A:  Yes.

44

Q:    It has a paint booth in the back?

A:    Yes.

Q:    That paint booth is for refurbishing cars, for painting cars?

A:    Yes.

Q:    Does your mom paint cars?

A:    My mom? No.

Q:    But you have used money from her to build that building?

A:    No. I used my money that my mom gave me to build the build the garage and put the big addition on the house. That's when I put my mom on the property

Q:    **How was that building benefitting your mom?**

A:    **It doesn't have to benefit mom. Everything in that building is sellable stuff. If mom needs any kind of care, that is how I make money. That's how—set up for me to make money. It has nothing to do with my mom.** Other than mom lives there. I asked mom what were we gonna do. She said you have got the money; use it. And that's what I did.

Id. at 133–134 (emphasis added).

76. On re-direct, Petitioner alleged that he had $250,000 worth of cars in the building that could be sold "within two weeks" to raise money to fund care for I.M.R. Id. at 134.

77. Finally, follow-up questions from the Court revealed that Petitioner had not filed a federal income tax return since at least 2015 ("I don't file a tax return because I'm disabled. I stopped doing that."), had not notified the IRS that he had received significant funds from I.M.R., and likely had not even accounted for income from the sale of I.M.R.'s properties appropriately for tax purposes. Id. at 137–138.

78. The Court ordered that transcripts be prepared of all of the hearings, and allowed the parties 30 days after the filing of the transcript for the Third Hearing to file proposed findings of fact and conclusions of law. The

45

transcript was filed on February 28, 2022, meaning the parties had until March 30, 2022, to make their filings.

79. On March 30, 2022, the Agency filed an emergency petition for relief, seeking to set aside and vacate an alleged transfer by Petitioner of the farm from I.M.R. to the trust. The transfer was evidenced by a deed executed by Petitioner on March 16, 2022, allegedly acting as power of attorney for I.M.R., and recorded in the Dauphin County land records on March 18, 2022.

80. A hearing was held on the emergency petition on April 7, 2022 (the "Fourth Hearing"). The Agency presented the testimony of Ms. Hughes, and Petitioner presented the testimony of himself.

81. Per Ms. Hughes, the Agency learned of the transfer from the Huntingdon County Assistance Office, which was evaluating I.M.R.'s eligibility for medical assistance. As of the date just prior to the transfer, I.M.R. had a "penalty" of $748,269.60, which would mean she was not eligible for medical assistance for 4.24 years. The transfer made by Petitioner added $699,660 to the penalty amount, and extended the period of ineligibility to eight years. N.T., Fourth Hearing, at 1–3.

82. After claiming that he had made the transfer solely to address the matter of the farm not being in the trust that was raised at the Third Hearing, Petitioner testified that he had searched through I.M.R.'s documents and found not one but two prior powers of attorney. The first was from 2008 and the second was from 2016. Both had been signed by him. Id. at 10–12. He was able to locate it in a pile of papers "in my truck" which apparently also included I.M.R.'s will. Id. at 12, 13. After further examination by counsel for all parties regarding matters surrounding the execution and notarization of the powers of attorney, and hearing legal argument from counsel for the Agency and for I.M.R., the Court took a 15-minute recess to perform legal research. Id. at 13–28. Upon return from recess, Petitioner's counsel submitted to the court an executed copy of the Alleged POA, which Petitioner claimed he had also found in the pile of documents in his truck. Id. at 28. After making clear on the record that it was not making any

46

determinations regarding the validity or invalidity of any of the three powers of attorney that had been presented (including the Alleged POA), the Court set aside and vacated the transfer of the farm due to the alleged agent's failure to act in good faith and failure to act loyally for the principal's benefit. Id. at 28–29. This was set forth in a written order entered the same day.

83. On the following day, April 8, 2022, the Court entered the order appealed from, finding I.M.R. totally incapacitated and appointing the Agency as guardian of her person and estate.

## III. ANALYSIS

### A. Standard of Review and Pertinent Statutes

Here, the bulk of Petitioner's claims of error, though characterized as issues of law, are actually attacks upon this Court's determinations regarding the credibility of witnesses and the weight given to their testimony. This means he has a very high bar to overcome. The findings of an orphans' court judge, sitting without a jury, are accorded the same weight and effect as the verdict of a jury. In re: Jackson, 174 A.3d 14, 23 (Pa. Super. 2017) (citing and quoting In re: Paxson Trust I, 893 A.2d 99, 112–13 (Pa. Super. 2006). They cannot be reversed by an appellate court in the absence of an abuse of discretion or lack of evidentiary support. Id. This rule is of particular importance when applied to findings of fact predicated on the credibility of witnesses and the weight to be given to their testimony. Id. It is not sufficient for an appellant to persuade the higher court that it might have reached a different conclusion on the evidence than the one reached by the orphans' court, as an abuse of discretion is not merely an error in judgment. Id. Rather, to establish an abuse of discretion the appellant must establish: (i) that the orphans' court overrode or misapplied the law; (ii) the determination of the orphans' court is manifestly unreasonable; or (iii) the orphans' court acted based on partiality, prejudice, bias, or ill-will, as shown by the evidence of record. Id. The orphans' court's findings will be upheld if they are supported by competent

and adequate evidence, and will be overruled only if they are predicated upon capricious disbelief of competent and credible evidence. <u>Id.</u>

Under 20 Pa. C.S. § 5601(d), a power of attorney, other than one that is limited to making decisions regarding health care or mental health care, is valid only if accompanied by an acknowledgment signed by the agent using the form specified in the statute.[9]

Under 20 Pa. C.S. § 5601.3(a), an agent who has accepted appointment under a power of attorney (other than one that is limited to making decisions regarding health care or mental health care) shall do the following, regardless of any provisions in the power of attorney to the contrary:

> (1) Act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest.
>
> (2) Act in good faith.
>
> (3) Act only within the scope of authority granted in the power of attorney.

<u>Id.</u>

## B. Granting of the Records Petition Without Notice and Opportunity to Respond

Petitioner's first and second claims of error address the issue of the Court granting the Records Petition *ex parte*. Although Petitioner takes a slightly different tack here, these are the same claims he raised in his February 3, 2022,

---

[9] <u>See id.</u>

(d) Acknowledgment executed by agent.--An agent shall have no authority to act as agent under the power of attorney unless the agent has first executed and affixed to the power of attorney an acknowledgment in substantially the following form:

> I, .........., have read the attached power of attorney and am the person identified as the agent for the principal. I hereby acknowledge that when I act as agent:
>
> I shall act in accordance with the principal's reasonable expectations to the extent actually known by me and, otherwise, in the principal's best interest, act in good faith and act only within the scope of authority granted to me by the principal in the power of attorney.

........................................................................................................................
(Agent)                                    (Date)

48

motion *in limine*.  In the motion, Petitioner sought relief in the form of exclusion of all of the evidence obtained as a result of the Records Petition.  Here, Petitioner proffers no solution, but makes the bare claim that the granting of the Records Petition was "an abuse of discretion and/or an error of law."  The Court believes that appropriate and thorough discussion of the issues raised, and explanation of its reasons for denying the motion, occurred in open court at the beginning of the Third Hearing.  See N.T., Third Hearing, at 1–11.  However, a brief treatment is appropriate here.

As stated at the Third Hearing, the Court agrees with Petitioner that the Records Petition should not have been granted *ex parte* without notice and opportunity to respond for I.M.R.[10]  This holding is based on In the Interest of M.B., 686 A.2d 877 (Pa. Cmnwlth. 1996).  The Court does not, however, agree that Petitioner himself had a right to notice and opportunity to respond.  Despite being I.M.R.'s son[11] and despite allegedly having a power of attorney to manage her affairs, he did not have a direct interest in preventing disclosure of I.M.R.'s records to the Agency.  First, the fact that an individual has a power of attorney does not mean that they are automatically substituted for their principal in all legal matters.  Rather, it only permits the holder to act on the principal's behalf.  Second, and more significantly, the simple fact that Petitioner is I.M.R.'s son does not give him a direct interest in protecting her records.

Having established that the Records Petition should not have been granted without notice to I.M.R., the question turns to the appropriate resolution.  Petitioner would have the entirety of the evidence thrown out, the matter dismissed, and I.M.R. dropped off on his doorstep.  This is nowhere close to appropriate.  Such drastic action does not even occur in criminal matters without careful consideration and analysis.  Here, the Court, after finding no controlling caselaw, looked to the nature of the error and the impact it had on the case.  The

---

[10] The Court has corrected this error in procedure for records requests under the OAPSA in future matters, and does not take the issue lightly.

[11] Because the records request falls under the OAPSA, and not § 5511 of the Probate, Estates and Fiduciaries Code (the "PEF Code"; 20 Pa. C.S. §§ 101, *et seq.*), the expanded standing provision of § 5511(a) does not apply to the Records Petition.

49

most reasonable approach was to place the Agency in the position it would have been at the time of the filing of the Emergency Petition had the Records Petition not been granted, and then determine whether the remaining evidence was sufficient to support the emergency guardianship. This would mean that the Agency would have the testimony of Ms. Parks (conditions inside the home, I.M.R.'s care needs and cognitive impairment, and lack of round-the-clock care), Ms. Hughes (report of walkaway incident from PSP, denial of access to I.M.R. by Petitioner, intimidating and aggressive behavior by Petitioner at the home), and Ms. Heaton (attempts by Petitioner to intimidate the Agency into backing down, retaliatory actions against the Agency by Petitioner). These were more than sufficient to establish that I.M.R. was incapacitated and in need of an emergency guardian of both her person and her estate. As soon as the Agency was appointed as emergency guardian, it had full right and authority to access the records at issue. As a result, it was inevitable that the medical and financial records in question would have been discovered by the Agency and entered as evidence in this matter. The error was therefore harmless.

It must be noted that there are equitable considerations at play here. As noted by both counsel for the Agency and counsel for I.M.R., the motion *in limine* ultimately amounted to the "alleged perpetrator ... of financial exploitation asking that the Court enforce the victim's rights so that he doesn't get in trouble for what he did to the victim." N.T., Third Hearing, at 6–7 (argument of Attorney Kipphan); see also id. at 8–10 (argument of Attorney Ghaner). The focus of this matter is I.M.R., and not Petitioner. Allowing him to enforce her rights to shield himself so that he may continue his abusive behavior toward her and her property would amount to an abuse of the law and of the courts.

### C. Granting of the Emergency Petition

Petitioner's third and fourth claims of error pertain to the granting of the Emergency Petition. The third claim is that the Court erred in granting the Emergency Petition without a hearing "when there was no adequate proof of an actual emergency." The fourth claim pertains to the granting of the Petition

"without any medical expert testimony or any medical evidence showing a need for guardianship."

The Court has reviewed the extensive record and filings in this matter, and has not found a point at which Petitioner has raised these specific issues before. This means that they have been waived. However, in the event that the Superior Court finds that they have not been waived or are non-waivable, the Court addresses them here.

As an initial matter, it must be noted that while § 5513 of the PEF Code incorporates the requirements for full guardianship proceedings under § 5511, it also provides an exception for those requirements in situations where "the court has found that it is not feasible in the circumstances" to satisfy them prior to granting the emergency guardianship. See, e.g., In re: Sylvester, 598 A.2d 76, 78, 82 (Pa. Super. 1991) (orphans' court properly dispensed with § 5511 notice to the appellants, both holders of powers of attorney executed by the incapacitated person and both executors under his will, under the exception set forth in § 5513; appellants were alleged to have been isolating the incapacitated person from his friends, disposing of his assets against his wishes, and misappropriating his assets for their own benefit; notice to the appellants under such circumstances would have provided them with time to take additional harmful actions toward to the incapacitated person and hide assets so they could not be recovered).[12] Thus, there are situations in which the requirements of § 5511 may be waived.[13]

Turning to the analysis of Petitioner's third and fourth claims, these claims of error present a question that is somewhat convoluted, but ultimately easily resolved. Specifically, Petitioner is arguing from a position that assumes his late-

---

[12] See also In re: Estate of Dorone, 517 Pa. 3, 7, 9 (1987) (The orphans' court properly disposed of notice to the incapacitated person's parents and conducted a brief hearing via telephone with the administrator and surgeon for the hospital where the incapacitated person was a patient before granting the emergency petition to appoint a temporary guardian to consent to medical procedures; the incapacitated person had been seriously injured in an accident, was unconscious, needed emergency surgery, was lying on the operating table at the time of the telephone hearing, and his parents refused to give permission for a blood transfusion necessary for the surgery to occur; the orphans' court's actions were reasonable under the circumstances).

[13] The Court notes that it recognizes and respects the need to follow the requirements of § 5511 in regard to emergency guardianships in the absence of circumstances that render such compliance not feasible. Invoking this exception is not the standard practice of the Court, and the issue should have been noted clearly in the order granting the Emergency Petition.

filed motion *in limine* precludes any consideration of the information the Agency obtained using the records request. This is significant because the Agency based the Emergency Petition exclusively on the medical information obtained from Dr. Sellers, and did not include any of the information obtained from Ms. Parks or by Ms. Hughes's and Ms. Heaton's interactions with I.M.R. and Petitioner.

### 1. Analysis of the Emergency Petition as filed.

The Court believes that the equities of this situation, including the facts that the motion *in limine* was filed late in the action and that the Agency's unprecedented difficulty in obtaining records and information regarding I.M.R. was due to Petitioner's own actions, do not merit excluding the information from Dr. Sellers in analyzing the Emergency Petition. Moving forward on this basis (i.e., on the information the Court was actually presented with at the time the Emergency Petition was filed), Petitioner's claims have no merit. The Emergency Petition clearly alleged that I.M.R. was in immediate need of round-the-clock care, did not have such care, and could not provide for her own care and safety due to her cognitive impairment. That is an emergency situation by any objective measure, and thus the Court appropriately moved forward prior to conducting a hearing so that appropriate housing and care could be provided for I.M.R. immediately. This addresses Petitioner's third claim. As for his fourth claim, the Emergency Petition was supported by the statement from Dr. Sellers, which is sufficient to meet the requirements of § 5518 of the PEF Code.

### 2. Analysis in the absence of information obtained using the Records Petition.

Assuming, *arguendo*, that Petitioner's position is correct, and that the Emergency Petition must be evaluated without the benefit of information obtained using the Records Petition, the only fair and equitable way to address the situation is to evaluate the position the Agency **would have** been in without the Records Petition, and therefore what information it **could have** included in the Emergency

52

Petition.[14] Even proceeding on this basis, Petitioner's third and fourth claims of error fail.

As noted above, Ms. Parks provided significant, credible testimony regarding the degree of I.M.R.'s cognitive impairment, her need for constant monitoring and care, the failure of Petitioner to provide such constant monitoring and care, and the deplorable living conditions in Petitioner's home. Ms. Hughes provided credible testimony regarding Petitioner's tight control over I.M.R., his intimidation of I.M.R., his attempts to intimidate Ms. Hughes, his refusal to allow I.M.R. to be interviewed separately, his refusal to allow anyone from the Agency inside the home, and his refusal to provide any information regarding I.M.R.'s medical condition and financial resources. Ms. Hughes's testimony was supported by the testimony of Ms. Heaton, which further included Petitioner's attempts to harass and intimidate the Agency into dropping its investigation. Finally, there was the highly concerning nature of the walkaway that occurred in September 2021. This information is more than sufficient to establish that I.M.R. was at risk and an emergency situation existed, such that she needed to be removed from the home prior to a hearing being held. This negates Petitioner's third claim.

With respect to Petitioner's fourth claim, Petitioner's assertion that the Agency was required to present the Court with medical expert testimony and medical evidence showing a need for an emergency guardianship is false as a matter of law.

> Medical testimony is of great significance since it assists the trial court in determining the nature, severity, and consequences of an alleged incompetent's disability. The Pennsylvania Supreme Court has stated in dicta that "[e]xpert testimony is needed when transactions fall within the penumbra between competence and incompetence, when the light of reason may come and go unbidden." *Hagopian v. Eskandarian*, 396 Pa. 401, 404, 153 A.2d 897, 899 (1959), *cert. denied*, 361 U.S. 938, 80 S.Ct. 381, 4 L.Ed.2d 358 (1960). However, the appellate courts have never adopted a rule of evidence which would require the use of expert testimony in all incompetency proceedings without exception. The testimony of lay witnesses who have observed the alleged incompetent is admissible and highly probative

---

[14] To do otherwise would reward Petitioner for his behavior in stonewalling the Agency and ignore the overwhelming evidence of I.M.R.'s incapacity and need for a guardian of both her person and her estate.

since "[o]ne's mental capacity is best determined by his spoken words, his acts, and his conduct." *Urquhart Estate*, 431 Pa. 134, 142, 245 A.2d 141, 146 (1968). *See also Weir by Gasper v. Ciao*, 364 Pa.Super. 490, 494-495, 528 A.2d 616, 619-620 (1987) (court may base finding of competency on evidence provided by lay witness).

Although the introduction of expert testimony from psychiatrists, psychiatric nurses, and other health care professionals is to be encouraged, we cannot say that lay testimony alone can never be sufficient to meet the heavy burden of establishing incompetency.

In re: Estate of Wood, 533 A.2d 772, 774 (Pa. Super. 1987) (internal quotations and citations as in the original).

Here, the core allegations of the Emergency Petition were that I.M.R. was an 83 year-old woman who suffered from debilitating cognitive impairment, was in immediate need of round-the-clock care, and was not receiving that care. The Agency was in possession of, and presented to the Court at the First Hearing, evidence in support of those allegations from: (1) Ms. Parks, a lay witness with direct and extensive knowledge of I.M.R.'s day-to-day care needs, mental condition, and living situation; and (2) Ms. Hughes, a lay witnesses experienced in the field of elder care, who had personally seen the nature of the interactions between I.M.R. and Petitioner; and (3) Ms. Heaton, a lay witness experienced in the field of elder care who has investigated countless cases of elder abuse and neglect, who personally interacted with Petitioner and observed his actions in response to the Agency's attempts to investigate the situation and determine if I.M.R.'s needs were being met. That evidence is sufficient both to meet the requirements of § 5518 and to establish that I.M.R. was in need of an emergency guardian.

## D. Denial of Attorney O'Toole's Petition to Represent I.M.R.

Petitioner's fifth claim of error arises from his first avenue of attack against the guardianship proceedings, which was to attempt to have Attorney O'Toole appointed as counsel for I.M.R. The Court addressed this issue at length in its order and opinion filed January 24, 2022, and incorporates that order and opinion by reference here. The Court will not provide further analysis of the issue here. However, it is appropriate to note that Attorney O'Toole's petition, which was

requested and directed by Petitioner, is a rather bold attempt by Petitioner to take control of the proceedings and, ultimately, retain control over I.M.R. and her assets.

### E. Failure to Appoint Petitioner as Guardian Based on Alleged Weaknesses in the Agency's Evidence

Petitioner's sixth claim of error contains a number of issues, and thus bears repeating here.

> The trial court abused its discretion and/or made an error of law when it failed to appoint William Cardwell as guardian of Iva M. Roush's person despite no Area Agency on Aging observing inside their home; only one (1) caretaker witness who observed William Cardwell and Iva M. Roush together inside the home over a span of a few months; and Iva M. Roush walking away from the home on one (1) brief occasion three months before the guardianship petition was filed?

The first item of note is that this claim of error contains an implicit admission—that I.M.R. is incapacitated and in need of a guardian. This admission alone should be sufficient to negate the previous four claims of error raised by Petitioner, because he is attempting to argue out of both sides of his mouth. On the one hand, he argues that this Court erred in finding I.M.R. incapacitated and in need of a guardian based on the overwhelming evidence presented. On the other hand, he now says that the Court rightfully found I.M.R. to be incapacitated and erred only with respect to its judgment as to who should be her guardian. Only under the application of the most twisted and disingenuous pretzel logic can these two positions be reconciled.

Turning to the claim itself, what Petitioner is really challenging is this Court's determinations regarding the credibility of the witnesses and the weight to be given to their testimony. The Court found Ms. Parks to be credible, and her testimony alone is sufficient to find that Petitioner was not providing I.M.R. with the care she needs. The Court found Ms. Hughes and Ms. Heaton to be credible as well, and their testimony regarding Petitioner's behavior and actions only bolstered the Agency's argument that Petitioner is not a fit caretaker and guardian for I.M.R. To the extent that Petitioner claims this evidence is weak because

55

neither Ms. Hughes nor Ms. Heaton ever entered the home, he has only himself to blame. He blocked all of their attempts at entry. Finally, it is both troubling and telling that Petitioner continues to attempt to downplay I.M.R.'s walkaway in September 2021 as a minor event. His 83 year-old mother, a woman who must use a walker to get around, cannot perform tasks of daily living as simple as preparing food for herself, has significant cognitive impairment, and has serious hallucinatory episodes, left the home, walked an unspecified distance along busy roads[15] until someone stopped to help her, and wound up being transported to the Huntingdon PSP station. It is only by the grace of God that I.M.R. did not end up hit by a car or lost in the woods surrounding the area.

While Petitioner does not specifically mention the witnesses who testified in his favor regarding his care for I.M.R., he will undoubtedly tout their testimony in his brief. The Court found the testimony of Petitioner's cousins, Terry Lynn Lumbard-Monnat and Valerie Scott, to be generally credible, but of little weight. They each certainly believed that Petitioner took good and appropriate care of I.M.R., but they did not have enough awareness of her day-to-day needs and the situation in Petitioner's home to provide significant testimony on those matters. They also downplayed the extent of I.M.R.'s cognitive decline, focusing primarily on what she can still do as opposed to how her limitations affect her ability to make decisions and take care of herself. With respect to the testimony of Dr. William Kauffman, the Court found it to be largely irrelevant and worthy of little weight. Dr. Kauffman has never treated I.M.R., has not evaluated her, has only "read her charts" occasionally when she was in the hospital, and the primary thrust of his testimony was an attempt to weaken the findings of Dr. Roscoe, I.M.R.'s current treating physician.

There remains, of course, Petitioner's own testimony regarding the care he provided for I.M.R. Petitioner certainly appeared to believe his repeated, self-serving, and conclusory statements that he took excellent care of I.M.R., gave her

---

[15] The Court takes judicial notice of the fact that while Tussey Lane, the road that Petitioner's home is located on, may be a low-traffic road, it leads to State Route 26. State Route 26 is the major north-south route on the western side of Raystown Lake, the only route that leads from Petitioner's home to the Huntingdon PSP station, has a prevailing speed limit of 55 MPH, and is definitely "high-traffic."

56

exactly what she needed, and that she "wanted for nothing." Yet his testimony also showed that he is not cognizant of I.M.R.'s care needs, did not provide round-the-clock care, left her on her own in the house often (regardless of the fact that he or his mechanic were elsewhere on the property), and downplayed the very real risks to her safety. And all the while, he was reducing her net worth by hundreds of thousands of dollars, significantly benefiting himself and harming her best interest. On these facts it is unquestionable that Petitioner is not an appropriate guardian for I.M.R.

F. *Failure to Appoint Petitioner as Guardian Based on the Claim that I.M.R. Desired to Give All of Her Assets to Petitioner and that He had Authority to Do With Them as He Pleased*

As with Petitioner's sixth claim of error, his seventh claim of error contains a number of issues, and bears repeating here.

> The trial court abused its discretion and/or made an error of law when it failed to appoint William Cardwell as guardian of Iva M. Roush's estate in light of four (4) witnesses and the estate planning documents presented clearly stating Iva M. Roush's desired intention for William Cardwell to inherit everything from her and the ability to make gifts to himself?

It is axiomatic that the law recognizes the right of a competent person to do as they wish with their assets, even if they spend or distribute those assets to the point of insolvency, and whether they take such action while alive or in a testamentary capacity after death. And, the law establishes a strong preference for choices made by individuals prior to incapacity when appointing guardians. 20 Pa. C.S. § 5511(f) ("If appropriate, the court shall give preference to a nominee of the incapacitated person."). However, the law does not recognize: (i) a right for agents acting under a power of attorney to take actions that are both against an incapacitated person's best interests and contrary to their previously expressed wishes; (ii) a right for heirs having control of an incapacitated person's property to take their inheritance prior to the incapacitated person's death; or (iii) a right for trustees to take trust property and use it as their own. Yet all of these actions occurred in this case.

57

As a preliminary matter, the Court notes that Petitioner's count of witnesses for this claim of error is incorrect. Presumably the four witnesses to which he refers are himself, his cousins Terry Lynn Lumbard-Monnat and Valerie Scott, and Attorney O'Toole. However, Attorney O'Toole never testified as a witness, and his comments and filings regarding I.M.R.'s actions and intent were purely in the form of allegations and argument intended to support his petition to represent I.M.R. Petitioner attempted to testify as to what I.M.R. told him her wishes were, but that evidence was not admitted because it is hearsay. See, e.g., N.T., Third Hearing, at 106, 111. Even if admissible, such testimony has little weight, not only because of Petitioner's own self-interest (his interests with respect to the financial issues are adverse to I.M.R.'s), but also because: (i) there is a vast difference between the general statement "I want you to have everything" and the alleged implication "I want you to take everything I have now, use it for your own benefit, and leave me with minimal income and no eligibility for medical assistance despite my progressively worsening condition"; and (ii) the competency of I.M.R. when she made the statements is highly suspect, particularly since she had already been suffering from dementia for four years when her husband died and Petitioner took control of her life and property.

As such, there were only two witnesses—Ms. Lumbard-Monnat and Ms. Scott—who provided testimony to the effect that I.M.R. had expressed a desire to give all of her property to Petitioner. However, their testimony on this point has only nominal weight. First, aside from the matter of self-interest, their testimony suffers from the same issues as identified for Petitioner's testimony above. Second, their primary interactions with I.M.R. have been short, periodic visits, and the time period covered by their testimony is well after I.M.R. was diagnosed with dementia and began suffering cognitive impairment.

Turning to the core of Petitioner's seventh claim of error, that the Court erred in not appointing him as guardian of I.M.R.'s estate, the issues raised by Petitioner are largely irrelevant. This is because the preference for the incapacitated person's chosen agent or guardian is strong, but not absolute.

58

> When a patient has executed a [durable power of attorney] and named a personal representative, that choice is given paramount importance. *In Re Sylvester*, 409 Pa.Super. 439, 598 A.2d 76, 83 (1991). Under these circumstances, Section 5604(c)(2), regulating durable powers of attorney, must be read in conjunction with Section 5511. *Id.* **Read together, these Sections require the court to give effect to the patient's selection of a guardian, except for good cause or disqualification.** *Id.*

In re: Duran, 769 A.2d 497, 506 (Pa. Super. 2001) (internal citations as in the original; emphasis added).

Assuming, *arguendo*, that I.M.R. clearly and competently expressed an intent for Petitioner to take the $250,000 life insurance payment as a gift, and for him to be able to make other gifts of her property to himself via a valid power of attorney, his actions were so noncompliant with the Alleged POA, trust document, and controlling law as to be nearly unfathomable.

Petitioner maintained no separation between his own funds and I.M.R.'s. He stated many times that her assets were his, and that she had no assets other than her income from the farm rent and social security. He spent hundreds of thousands of dollars of her money to buy things that benefitted only himself.

The Alleged POA and the trust document contain clear provisions regarding the importance to I.M.R. of obtaining and maintaining eligibility for medical assistance benefits. Yet, Petitioner's actions led to an ineligibility period of over four years (which would have been extended to eight if the transfer of the farm had been upheld). Nothing in the trust document or the Alleged POA authorized Petitioner to avoid placing any of the real estate properties transferred to I.M.R. after her husband's death into the trust, and even if Petitioner actually believed the farm had been transferred into the trust, nothing authorized him to sell the remaining properties in the trust and keep the proceeds for himself.

Finally, even if it is true that Petitioner undertook the above actions (and others) based on the innocent belief that I.M.R. wanted him and had authorized him to do so, the testimony established that he is singularly unfit to manage her financial affairs. He had no awareness of the medical assistance eligibility issue, no idea about his recordkeeping obligations, no awareness of the risk of converting

appreciating assets (land) into depreciating assets (cars, building, paint shop), and no awareness of the fact that was a poor idea to allow an 83 year-old dementia patient in need of long term care to spend hours at a time sitting in a casino losing $10,000 a visit. He also likely created significant federal income tax risk for himself and I.M.R. by failing to properly report the alleged gift transfers and failing to file income tax returns.

The sum total of all of these issues is that it is beyond a reasonable doubt that there is good cause to override I.M.R.'s selection of Petitioner as her agent with respect to her estate, and that he should be disqualified from serving in that capacity.

## G. The Court's Order Vacating and Setting Aside Petitioner's Attempt to Transfer the Farm Into the Trust

The Court first notes that, as identified by the Superior Court in its March 16, 2020 opinion remanding the case to this Court for the entry of a full Rule 1925 opinion, Petitioner did not file a timely appeal from the separate order regarding the property transfer, and that issue has therefore been waived. See Superior Court Opinion, Docket No. 728 MDA 2022, March 16, 2023, at 3–4 n. 1.

> In a separate order, the orphans' court invalidated a March 18, 2022 transfer of land stating that "if there was a valid power of attorney, the alleged agent has failed to act in good faith and failed to act loyally for the principal's benefit." Orphans' Court Order, 4/7/22. As Appellant failed to appeal that order, this Court will not address it or the propriety of the deed referenced in Appellant's statement of questions presented.

Should the Superior Court decide, upon further reflection, to take up this issue, Petitioner's eighth claim of error is meritless. As stated, he bases it on there being no request from the Agency to remove Petitioner as power of attorney and no order from this Court removing him as power of attorney prior to him signing the deed on March 16, 2022. This is a red herring. The Court made no determination regarding whether Petitioner had a valid power of attorney on March 16, 2022. Instead, the Court, as noted in the order, found that if there was a valid power of attorney, Petitioner had failed to act in good faith and loyally for

60

I.M.R.'s benefit.[16] His act of transferring the farm into the trust was clearly an attempt to wrest control of I.M.R.'s sole remaining significant asset away from the Agency, and to prevent the Agency from potentially using it to pay for I.M.R.'s care, as Petitioner is the sole trustee of the trust and admitted that he had already taken out loans from Darren Weaver in anticipation of selling the farm to him in the future. Further, this act risked nearly doubling I.M.R.'s period of ineligibility for medical assistance to eight years. By any objective measure, Petitioner's transfer of the farm was neither in good faith nor done for I.M.R.'s benefit.

Finally, Petitioner's argument regarding his alleged removal as power of attorney has a fatal flaw in its logic. Petitioner did not submit a signed copy of the Alleged POA, or any power of attorney, to the Court prior to attempting to transfer the farm. Therefore, neither the Agency nor the Court would have had any reason to address Petitioner's removal. Petitioner's actions were a complete surprise to the Agency, I.M.R.'s counsel, and the Court, as was his alleged location of not one, but three, signed powers of attorney behind the seat of his truck.[17] Petitioner cannot fault the Court and the Agency for failing to anticipate his unannounced and surprise attempt to make an end run around the emergency guardianship.

## IV. CONCLUSION

The focus of this case should be I.M.R. However, Petitioner has continuously attempted to make it about himself. Time and time again he has shown that his true concern is maintaining control over I.M.R. and her assets, rather than acting in her best interest. I.M.R. is incapacitated and in need of a guardian. That guardian needs to be someone other than Petitioner, so that he can no longer exploit her.

BY THE COURT:

_____
George N. Zanic, President Judge

---

[16] As required by 20 Pa. C.S. § 5601.3(a).

[17] The Court notes its high degree of skepticism regarding the validity of the "discovered" powers of attorney.

61